**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **Criminal No. 21-CR-40 (TNM)** |
| | : | |
| | : | |
| **ROBERT MORSS,** | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S OPPOSITION TO**
**DEFENDANT'S MOTION FOR PRE-**
**TRIAL RELEASE**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to the motion for release by the Defendant, Robert Morss.  Over a two-and-a-half-hour period, the Defendant repeatedly attacked officers and helped lead others in the effort to overtake the Capitol on January 6, 2021. There are no conditions or combinations of conditions that can effectively ensure the safety of any other person and the community, pursuant to 18 U.S.C. § 3142(e).

The government respectfully requests that the following points and authorities, as well as any other facts, arguments and authorities presented at any hearing, be considered in the Court's determination regarding pre-trial detention.

**Factual Background**

**The Attack on the United States Capitol on January 6, 2021.**

1

1.      On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, located at First Street Southeast, Washington, District of Columbia. During the joint session, elected members of the United States House of Representatives and Senate met in the United States Capitol to certify the vote count of the Electoral College for the 2020 Presidential Election, which took place on November 3, 2020.

2.      The United States Capitol is secured 24 hours a day by security barriers and USCP occupy various posts throughout the grounds. Restrictions around the United States Capitol include permanent and temporary security barriers and posts manned by USCP. USCP officers wore uniforms with clearly marked police patches, insignia, badges, and other law enforcement equipment. Only authorized people with appropriate identification are allowed access inside the United States Capitol. On January 6, 2021, the exterior plaza of the United States Capitol was also closed to members of the public.

3.      The January 6, 2021 joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Michael R. Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4.      As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the United States Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the United States Capitol building and USCP were present, attempting to keep the crowd away from the Capitol building and the proceedings underway inside. As the certification proceedings were underway, the exterior doors and windows of the Capitol were locked or

otherwise secured.

5.      At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades, and past officers of the USCP, and the crowd advanced to the exterior façade of the building.  The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by the USCP or other authorized security officials.

6.      A short time later, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including Vice President Pence, were instructed to—and did—evacuate the chambers. As such, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day.  In light of the dangerous circumstances caused by the unlawful entry to the United States Capitol, including the danger posed by individuals who had entered the United States Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the United States Capitol, and the building had been confirmed secured.  The proceedings resumed at approximately 8:00 p.m. after the building had been secured.  Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

7.      After the Capitol was breached, USCP requested assistance from MPD and other law enforcement agencies in the area to protect the Capitol, keep more people from entering the Capitol, and expel the crowd that was inside the Capitol.  Multiple MPD officers and other law enforcement officers came to assist.

**<u>Facts Specifically Related to Morss</u>**

8.      As captured on USCP surveillance, police Body Worn Camera ("BWC") footage, and various videos posted to social media and YouTube, on January 6, 2021, law enforcement to include USCP and MPD were along a temporary fence line on the first landing of the Lower West Terrace area of the Capitol.  Law enforcement stood behind the metal fencing shoulder to shoulder.  As time moved on, the crowd started to push and tear down the fencing separating them and law enforcement.  Law enforcement attempted to push back and reestablish the fence line.  During this time objects were thrown at officers, physical assaults occurred, and chemical irritants were used.

9.      Morss is visible in this crowd early on.  For example, around 2:09 p.m., a few minutes after the crowd can be seen on BWC footage unsuccessfully trying to violently push through the fence separating the crowd from the Capitol and while officers are repeatedly asking the crowd to back up, Morss can be seen on BWC footage.   As captured on BWC footage included in Exhibit B, after being asked to back up, Morss grabs the officer's baton and tries to rip it away, as shown in the still below with a red arrow above Morss.[1]  (Morss does not appear to be successful in ripping away the baton.)



_____

[1] All red boxes or arrows in the exhibits have been by the government to help assist the viewer.

10.     At approximately 2:14 p.m., Morss can be seen on BWC footage again, as shown in Exhibit C.  On the video, he comes up behind those at the front line of the crowd facing law enforcement and stands there for about a minute.  Morss then seems to speak to the person to his right (who appears to be one of the same individuals he was photographed with near the National Monument earlier) and then to the person on his left.  The person to his left can be seen nodding as if in response.  A few seconds later, as shown in the still below, Morss reaches through the crowd and grabs the fence being held by the MPD officer and being used to keep the crowd back. As seen on the video, Morss then rips the fence out of the hands of the officer, with the assistance of the other rioters, including the one that appeared to nod in response to something Morss said right before grabbing the fence.  Morss then retreats back into the crowd with the fence.



11.     At approximately 2:26 p.m., Morss can again be seen on BWC footage, as shown in Exhibit D. While wearing a neck gaiter covering his mouth, it appears as though Morss was addressing the officers and can be heard saying, "You guys are betraying us.  You get paid enough to betray your people?" Morss then points and says, "look they are coming in over there."  In a different BWC video, as shown in the still below, Morss then says "This is our Capitol. This is our Capitol."



12.    Then around 2:30 p.m., after the crowd again surged forward and pushed the officers further back, Morss can be seen on BWC footage at the front of the rioters waiving a yellow flag, as captured in the still below with a red box around Morss.  Morss can be heard telling the officers: "take a look around, back up, we are going to take our Capitol back."  (This BWC clip is included as Exhibit E.)



13.    By that point, asshown in the still from USCP surveillance below, rioters had engulfed the west side of the Capitol and officers had begun retreating from the first landing of the Lower West Terrace. The sheer number of rioters overwhelming and surrounding the officers being forced to retreat is even more apparent in surveillance video.   Morss was essentially at the frontline of an enormous crowd surrounding and pushing back the officers. (Morss is outlined in

a red box below and can be seen carrying the yellow flag in the same position as he is visible in the still from Exhibit E above)



14.     Around 2:33 p.m., as captured on BWC footage shown in Exhibit F, as the huge crowd of rioters continued to advance and law enforcement began to retreat, Morss and two unidentified individuals struggled over a black flag pole with an MPD officer, as shown in the still below with a red arrow above Morss.



15.     Around 15 seconds later, as captured on BWC footage in Exhibit F, a helmet visor was thrown at an MPD officer presumably from someone in the crowd, the MPD officer attempted to pick up the visor off the ground.  Morss grabbed the visor as well and attempted to pull it out of the MPD officer's hands.  The MPD Officer was able to pull away with the visor. At that point, Morss lunged forward and grabbed the visor again; Morss and unidentified individuals then tried to rip the visor out of the officer's hand.  (This is shown in the stills below with a red box around Morss.)  The MPD officer then regained control of the visor.



16.     As captured on BWC (included as Exhibit G) and surveillance footage, the rioters continued to move forward, yelling at officers to retreat.  Around 2:35 p.m., Morss can be seen on BWC footage near the front lines of the rioters surrounding the officers, as shown in the still below with Morss (marked by a red arrow) motioning at the officers to retreat while holding a yellow flag.



17.      Around the same time, rioters were climbing on the scaffolding in front of
building as well as various features of the building.  Although the Capitol Building had already
been breached and protesters had flooded in through several entrances, a group of MPD officers
and members of the USCP and other agencies called to assist gathered to protect the Capitol at
the very prominent entrance on the second landing of the Lower West Terrace.  (This is the exit
through which the President typically comes through during inauguration, as pictured below in a
photo from later that night.)  To enter the Capitol through the Lower West Terrace doors on
January 6, one had to walk, climb, or scale up to the second landing, go up a set of stairs, walk
through an arch and a short tunnel, and then walk through a series of glass doorways that the
officers had locked.  The tunnel and doorways are very narrow, with the entryway through the
doors measuring only around 10 feet across.



18.      Around 2:40 PM, a group of law enforcement officers were maintaining a line at
the second set of glass doors inside the tunnel.  Officers reporting to the scene rushed to the
tunnel from within the building while rioters outside of the tunnel continued to summon more

men to push their way through the tunnel.  A growing number of protesters made their way into the tunnel with a variety of tools and weapons and the tunnel became the point of one of the more intense and prolonged clashes between protesters and law enforcement at the Capitol on that day.  Many of the protesters in the tunnel were recording video and many of the videos continue to circulate Internet channels, social media, and the news.  Much of the fighting over the next two and a half hours was also captured on surveillance footage from a camera above the Lower West Terrace doorway, BWC footage, and in video footage posted to YouTube (hereinafter, YouTube Video 1).  In YouTube Video 1, which was filmed by a member of the press, a large group of rioters attempted to break through the line of uniformed law enforcement officers who were in place to prevent rioters from entering the Lower West Terrace door of the United States Capitol.  Law enforcement officers were at the front of the doors inside the tunnel attempting to stop numerous rioters from gaining access to the U.S. Capitol.

19.     At approximately, 2:57 p.m., Morss is visible in USCP surveillance footage at the entrance of the tunnel, where he stays for the next few minutes.  Morss can be seen in this surveillance footage with both the same yellow flag and goggles that he is pictured with in the BWC footage described above.

20.      As captured on USCP surveillance footage, included as Exhibit H, Morss hung back by the entrance to the tunnel for a few minutes. Then around 3:02 p.m., he pushed his way forward towards the line of officers guarding the Lower West Terrace doors to the Capitol.

21.     As captured on YouTube Video 1, a clip of which is included as Exhibit I, Morss joined the rioters directly confronting the officers guarding the Lower West Terrace doors.  Morss then grabbed an MPD Officer's shield.   As captured on Exhibit I, Morss continued pushing and

pulling against law enforcement shields and the officers holding those shields for the next few minutes, as shown in the still below with a red box around Morss, which corresponds to around 1 minute and 40 seconds into Exhibit I.



22.     As captured on Exhibit I, Morss, with the assistance of other rioters then began to rip the USCP riot shield away from an MPD officer, while he (or someone near him) yelled "send the shield back, send the shield back!"  Together, Morss and the rioters assisting him (including co-defendant Quaglin, who is visible in this and other videos of the event) successfully ripped the USCP riot shield from the MPD officer, nearly dragging him into the crowd in the process.  (The same event is captured in other videos as well, such as around 2 minutes and 10 seconds into Exhibit I-2, a video posted to social media by another defendant in the same tunnel at that time.)

23.     Then, around 3:05 p.m., as seen in USCP surveillance footage (a clip of which is included in Exhibit J), Morss carried the shield away and passed the shield back to the rioters behind him, who passed it back into the crowd.

24.     As captured on USCP surveillance footage, included in Exhibit J, at approximately 3:06 p.m., Morss then walked out of the tunnel and into the crowd near the arch entrance to the tunnel.  As captured in a video posted to YouTube, hereinafter YouTube Video 2, upon exiting the tunnel, Morss can be seen on the steps that lead to the tunnel.  Morss yelled into the crowd, "shield wall" and started yelling for people to pass up police riot shields.  A clip from YouTube Video 2 is included as Exhibit K.  (As with many of these exhibits, multiple of his co-defendants are captured in this same exhibit, such as co-defendant Judd who stands next to him yelling for shields.)

25.     As shown in Exhibit K, shields were then passed from the crowd to Morss and others by the tunnel's front entrance.  The shields were then passed to the rioters at the front of the line confronting the officers guarding the doors with Morss then quickly returning into to the tunnel to apparently direct the activity, as shown in surveillance video.  (A clip from this USCP surveillance footage is included as Exhibit L.)

26.     Morss re-entered the tunnel at approximately 3:07 p.m., as captured on surveillance footage.  As captured in a video posted to YouTube, hereinafter YouTube Video 3, which shows the same activity as the USCP surveillance footage from a different angle, Morss entered the tunnel and started to instruct rioters who had shields in their possession to organize a shield wall.  (A clip from YouTube 3 is included as Exhibit M.)  Morss yelled out: "Hey, everyone with a shield, back up and organize! Make a shield wall!  Organize right now and make a shield wall.  Where are those fucking shields!"   This is captured in the first 30 seconds of Exhibit M.  (The same is captured in Exhibit I-1 around 4 minutes and 15 seconds.)

27.     As shown in USCP surveillance footage and around 1 minutes and 12 seconds into Exhibit M, Morss then walked toward the front of the tunnel bracing both arms on the back of the person directly in front of him and began pushing forward.   Morss then pushed with the crowd together as they pushed in unison attempting to break past the officers guarding the Lower West Terrace doors.

28.     As captured around 1 minute and 50 seconds into Exhibit M (and visible in USCP surveillance footage), around 3:08 p.m., Morss then instructed an individual to the side of the tunnel with a flag to "block out" or "take out" the camera, while pointing to the USCP camera affixed above the doors in the tunnel, as shown in the still below with a red box around Morss. The individual he was speaking to then began to repeatedly knock out or block the camera with the tip of the flag pole.  (This camera was part of the USCP security footage.)



29.     Around 3:10 p.m. as shown on surveillance video, Morss, who now held a shield moved away from the front line of rioters and towards the arch.  He stayed in the tunnel, holding the shield, as shown in the still below with a red box around Morss.  Morss then passed the shield off to another rioter and once again began pushing with the group in an attempt to break

through the officers guarding the doors.  (This is captured from the beginning until around 1

minute and 21 seconds into Exhibit N, a clip from surveillance video.)

30.     As seen in surveillance footage and YouTube Video 1, Morss then continued to

use his entire body to push against the rioters in front of him as the group tried to use the shields

to push past the officers guarding the door.  As can be heard in YouTube Video 1, the group of

rioters all yelled "heave ho" as they pushed in unison against the officers guarding the doors.

(This is shown in the still from YouTube Video 1 below, with Morss in the red box.)  It was

during this time that an MPD officer was being violently crushed against the first set of doors

with a shield held by one of his co-defendants, as also captured in YouTube Video 1.   (A clip

from this part of YouTube Video 1 is included as Exhibit O.  This is also captured from around 1

minute and 21 seconds to 2 minutes of the security footage in Exhibit N.)



31.     Around 3:12 p.m., as captured on surveillance video, Morss then passed another

shield and also passed what appeared to be a riot style baton off to another rioter behind him, as

shown in the still below with a red box around Morss.  Around 3:14 p.m., Morss eventually

walked out of the tunnel and back into the crowd, as can be seen in both surveillance footage and

various photos and videos posted online.   (Exhibit N from around 2 minutes until the end

captures this.)



32.     Around 3:48 p.m., as captured in a Parler video posted by ProPublica, Morss

stood in the crowd near a window to the right of the archway entrance to the Lower West Terrace

doors into the Capitol.  (Multiple other videos online show rioters breaking the window with

various tools over the preceding hour.)

33.     Then, in a video posted to YouTube, hereinafter YouTube Video 4, Morss and

other rioters climbed through the broken window into the Capitol, as shown in the still below

with a red box around Morss. Based on a comparison to surveillance footage showing some of

the same events, this occurred around 4:17 p.m.   (A clip from YouTube Video 4 is included as

Exhibit P.)  Multiple other videos posted online captured the same activity.



34.    The broken window Morss climbed through led to a hideaway office for members of Congress but does not appear to have been specifically assigned to anyone on January 6.  As captured on a livestream video from another rioter inside the room, furniture inside the room was toppled over and scattered, as well as some pieces appearing to be broken.  In that video, someone inside the room can be heard asking for a crowbar and masks, and there are banging sounds.  A few of the rioters are captured still breaking and pulling on a section of the remaining glass left in the window.  (A still from that video is below, with a red box around Morss. The video itself is included as Exhibit Q.)



35.    In another short video, filmed from within that same room by a separate rioter, Morss is again visible, as shown in the still below.  This video also shows other rioters in the room including furniture toppled over and scattered about, and legs missing from a desk as well as the drawers.   (Neither video captures Morss doing any breaking inside the room.  At this time, it is unknown what, if anything, he did inside the room for the at least 13 minutes or so he was inside.)



36.     Video posted online showed rioters handing out furniture from the room through the broken window at different times throughout the unrest.  Similar furniture (including what appear to be legs of chairs/tables and desk drawers) was then used by other rioters to attack officers guarding the Lower West Terrace doors, as captured by surveillance and BWC footage. Around what appears likely to be approximately 4:30 p.m.,[2] Morss can be seen inside the room and looking out after another window had been broken out, as shown in the media photograph below with a box around Morss.



---

[2] The timestamp listed for this photograph online appears to be one hour fast based on a comparison to surveillance footage capturing some of the same actions shown in photographs by the same photographer that day.

37.     In addition, multiple high-definition photographs were taken of Morss by members of the media that day, including, for example the below photograph from around 2:49 p.m.,[3] where scissors and what appears to be a knife can be seen tucked into pockets on his tactical vest, as shown in the red circles below.  A tourniquet is also visible next to the scissors.



*Identification of Morss*

38.     In February 2021, law enforcement interviewed four different witnesses that know Morss personally from multiple close interactions with him in a professional capacity. Each separately identified Morss as the individuals shown in the three pictures below, which were taken from the various videos and photos described above.

---

[3] As with the above, the timestamp listed online for photos by this photographer appear to be one hour fast based on a comparison to surveillance footage capturing some of the same actions shown in photographs by the same photographer that day.



39.     Financial records from an account owned by Morss show spending at what appears to be a gas station in Falls Church, VA, on January 7, 2021.  Similarly, based on a review of records obtained via a search warrant, Morss's Uber account showed travel from Virginia to Washington, D.C. on the morning of January 6, 2021.

40.     After his arrest, another witness, Witness 5, confirmed that Morss was the individual in the pictures above and further explained that Morss drove up to Washington D.C. with the two individuals wearing similar military clothing pictured in photos with him near the National Monument on January 6.

41.     Finally, after his arrest, Witness 6, who had been keeping some of his clothes and items from Morss's prior apartment, provided the FBI with a duffel bag of the clothes Morss can be seen wearing on January 6, which match exactly the items seen in all the videos and photos described above.  When recovered by law enforcement, the tactical vest he can be seen wearing in the videos had ballistic plates inside.  It also included two different knives.

*Arrest of Morss*

42.     During and after his arrest, law enforcment identified three different firearms at his home, including a handgun, a shotgun, and a rifle.  In addition, the same witness that

19

provided the clothes he wore on January 6 indicated that he also left several firearms at that location as well.

43.     Law enforcment also recovered a notebook from his car with writings that included "Step by Step To Create Hometown Militia."  It included a list of names, a list of equipment, and a list of steps, such as "Battle Drills"; "Ambush"; and "Formations."  The relevant pages, which are pictured below with names redacted out, also included notes such as: "Bring Kit/Body Armor"; "Bring Assault Rifle"; "4 Magazines."  (A photo of these entries is included as Exhibit R.)

44.     Law enforcement also recovered multiple texts sent from the number registered to Morss regarding his actions on January 6.  For instance, the texts include discussions before January 6 about ordering walkie talkies in advance and the fact that he would be wearing ballistic plates.  After January 6, he then had discussions about his concern over getting arrested, the "ramifications" of January 6, and whether or not he should leave the country.  Given that the formatting of the messages makes them difficult to read, the government has included both a copy of the texts and a summary, which was filed in the prior detention hearing, included as Exhibit A.

45.     Finally, based on a review of his iCloud account, law enforcement identified what appears to be a speech he prepared for a judge in advance of his arrest.  (At this point it is not clear what the date was that he wrote this speech, as it does not appear to have a date of drafting included in the materials provided in his iCloud account.)  In this speech, labeled "should I have to appeal before a judge what I am gonna say" --- Morss makes it unequivocally clear that he does not renounce or regret his actions on the January 6.

| 1 | | **Title:**<br>**Source:** Apple iCloud Backup<br>**Labels:**<br>**Body:** Should I have to appeal before a judge what am I gonna say<br><br>None of you have missed a meal. Do you have a missed hair appointment. But the rest of America can't say the same.<br>The various and diverse communities of America have been taken advantage of for far too long.<br><br>You ask if I regret my involvement and what happened on the sixth my answer is resounding no.<br><br>If you thought that the capital as a temple of democracy was desecrated in a matter of five hours you choose not to see the desecration to our rights that has taken place within those halls of power for the last half century.<br><br>Pillars and pictures can be restored but rights once lost or taken are never returned.<br><br>You have officially lost the trust of more than half the American people.<br>You put your careers your reputation your paychecks before the people you claim to serve and we've watched you do it for way too long.<br><br>This isn't about politics any longer.  This isn't a petty football game to debate over. this isn't about Republicans or Democrats or whites or blacks this is about blatant negligence and abuse on behalf of the government for which stands over the people not as servants of the people.<br><br>With notable few exceptions,  a large majority of the people who continually feather their own nests at the expense of the people insult the concept that this is some kind of temple of democracy. That capital building isn't a temple at all it's a theater where is soothsayers and charlatans strip the American people of their rights.<br><br>We don't need trump anymore. The people across the political spectrum and from sea to shining sea have woken up to the long train of abuses that this twisted body of government has done.<br><br>(Say this last)To the left I see the rats into the right I see the snakes in my ear they're whispering sweet sermons of cruel hate<br>So do you buy the fear, or do you buy the lies<br>Tell me, what will set us free<br>Do we kneel before the crooked few<br>Or do we bite the fucking hand that feeds<br>**Parties:** | |
| | | **Source Extraction:** Legacy (4) | |

## Procedural History

46.     On June 11, 2021, FBI agents arrested the Defendant at his residence in Glenshaw,

Pennsylvania and brought him before a U.S. Magistrate Judge in the Western District of

Pennsylvania for an initial appearance and removal to this District. At that hearing, the

Defendant waived his right to have a detention hearing and a preliminary hearing in the arresting

district.

47.     Morss has since been indicted on eleven charges, including, among others, three

violations of 18 U.S.C. § 2111 (Robbery), two violations of 18 U.S.C. § 111(a) (Assaulting**,**

Resisting, or Impeding Certain Officers or Employees), one violation of 18 U.S.C. §

1512(c)(2)(Obstruction of an  Official Proceeding), and  one violation of 18 U.S.C. § 231(a)(3)

(Certain Acts During Civil Disorder).

48.     On July 20, 2021, after multiple days of hearings, including testimony from

Morss's family members and review of multiple video and paper exhibits, Magistrate Judge

Harvey determined by clear and convincing evidence that no combination of conditions other

than detention can adequately obtain the safety of the community.  In a lengthy opinion delivered

from the bench, Judge Harvey determined that all four factors in this case weighed in favor of

detention.

49.     On November 4, 2021, the Defendant filed a motion for release, citing primarily

the conditions at the jail as a basis for release.  However, because the Defendant has since been

transferred to a different facility, that issue is now moot.  The Defendant nonetheless asks for

release and a renewed analysis of his detention.

## **ARGUMENT**

50.     A defendant ordered detained by a magistrate judge may file "a motion for

revocation or amendment of the order" with "the court having original jurisdiction over the

offense." 18 U.S.C. § 3145(b). Although the D.C. Circuit has not ruled on the matter, every

circuit to consider the issue has found that a magistrate judge's detention order is subject to *de novo* review. *See United States v. Hunt*, 240 F. Supp. 3d 128, 132–33 (D.D.C. 2017).

51.     The Defendant has been indicted on three counts of robbery, in violation of 18 U.S.C. § 2111. Robbery is categorically a crime of violence. *See, e.g.*, *United States v. Shirley*, 808 F. App'x 672 (10th Cir. 2020) (holding that 18 U.S.C.S. § 2111 was a crime of violence); *United States v. Fultz*, 923 F.3d 1192, 1193 (9th Cir. 2019) (holding that 18 U.S.C.S. § 2111 was categorically a crime of violence); *see also Stokeling v. United States*, 139 S. Ct. 544, 550-54 (2019) (reasoning that common-law robbery is a crime of violence).  Every court of appeals to have addressed whether a form of federal robbery satisfies the requirements of Section 924(c)(3)(A) or a similarly worded provision, including the D.C. Circuit, has held that it does. *See United States v. Carr*, 946 F.3d 598, 604 (D.C. Cir. 2020) (bank robbery); *see also, e.g.*, *United States v. Boman*, 810 F.3d 534, 542-543 (8th Cir.) (robbery under 18 U.S.C. 2111), *cert. granted, vacated, and remanded on other grounds*, 137 S. Ct. 87 (2016); *United States v. Ellison*, 866 F.3d 32, 35-39 (1st Cir. 2017) (bank robbery); *United States v. Williams*, 864 F.3d 826, 830 (7th Cir. 2017) (same), cert. denied, No. 17-5551 (Oct. 2, 2017); *United States v. Jones*, 854 F.3d 737, 740 & n.2 (5th Cir. 2017) (carjacking and bank robbery), cert. denied, No. 17-5285 (Oct. 2, 2017). Thus, he is eligible for detention pursuant to 18 U.S.C. § 3142(f)(1)(A).

52.     There are four factors under § 3142(g) that the Court should consider and weigh in determining whether to detain a defendant pending trial: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. §3142(g).  In consideration of these factors,

the government respectfully submits that there are no conditions or combinations of conditions which can effectively ensure the safety of any other person and the community. In addition, the analysis emphasized by the D.C. Circuit recently in *United States v. Munchel*, 991 F.3d 1273 (D.C. Cir. 2021), supports the conclusion that detention is appropriate here.

### Nature and Circumstances of the Offenses Charged

53.     Morss's actions on January 6 place him in some of the most serious and dangerous of those charged for their actions that day.  For instance, when analyzing the *Chrestman* factors laid out by the Chief Judge to help distinguish between defendants from the 6th, most of those factors cut against Morss.  *See United States v. Chrestman*, — F. Supp. 3d —, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021) (Howell, C.J.).

54.     First, he has been charged with multiple serious felony offenses, including multiple counts of robbery.

55.     Second, as evidenced by his attire (which included goggles, a tactical vest with ballistic plates, a medical kit, a tourniquet, and at least one knife) and his text messages (which discuss the need for walkie talkies in advance), Morss did engage in some level of planning.  Morss came to the Capitol armed and ready for violence – wearing tactical gear, wearing goggles to no doubt avoid smoke or OC spray, and even having a knife and scissors tucked into his vest.  To put it simply, you do not need a ballistic plates to engage in a peaceful protest.

56.     Third, although he did not use a conventional weapon, he did use a shield to push up against officers in the tunnel.  Moreover, he repeatedly can be seen ripping or trying to rip away protective materials from officers, such as a shield, baton, and fence, and then passing out those materials to the rioters around him.

24

57. Fourth, Morss repeatedly coordinated with other rioters and took on a *de facto* leadership role at various times that day. Morss repeatedly not only assisted that mob in this violent battle against law enforcement but also repeatedly led the attack. Specifically, early on in that battle, Morss repeatedly ripped away (or tried to rip away) the very items law enforcement was using to protect themselves and keep the crowd at bay. For example, when he successfully ripped away a barrier fence keeping back the crowd from one of the officer's holding it around 2:14 p.m., Morss can be seen coordinating and getting others to help him in this effort – acting as a leader in the effort to take over the Capitol. Morss can then be seen at the forefront of the enormous crowd of rioters as they engulfed officers around 2:30 pm. Later, after the law enforcement officers had retreated and the crowd had overtaken the first landing of the Lower West Terrace, Morss helped organize the effort of a violent group of rioters trying to break through the Lower West Terrace doors. After Morss first made his way to the front of the rioters trying to push past law enforcement and then ripped away the item that should have been used by officers to protect themselves – a shield, he then went out into the crowd and encouraged others to pass back the stolen shields so the rioters could create a "shield wall." He then yelled at the rioters to "organize" and created that shield wall, with the rioters using the stolen shields to violently push against, and in some cases, crush, the officers guarding the doors. As he did earlier with the fence, he once again acted as a leader in this capacity, getting others in the group to work with him – work with him to attack the officers and push against them, work with him to rip the shield from an officer (nearly dragging that officer into the crowd in the process), and work with him to first pass that shield back and then to create a shield wall that was used to crush officers in the rioters' path. Morss continued to be a leader of the rioters inside the tunnel, telling

others to block out or take out the camera recording the rioters attacking law enforcement around

3:08 p.m.  He then re-joined the rioters violently pushing against the law enforcement officers

guarding the doors, heaving as a group while they yelled "heave-ho."  (This heave-ho left an

officer pinned against a door as co-defendant McCaughey pushed a shield up against him and co-

Defendant Cappuccio rioter ripped his mask off.)  The shield wall Morss organized and helped

create was pivotal in accomplishing this violent effort.

58.     Finally, in addition to repeatedly confronting law enforcement over an extended

time period and engaging in multiple assaultive efforts over the first hour and a half, he also

entered the building.  Although there is not yet any evidence that he personally broke or

damaged federal property, he did climb through a broken window into one of the congressional

hideaway offices and stayed in that room for a significant period of time as other rioters broke

apart furniture and windows.  Specifically, a little more than two hours after Morss first began

leading the effort to push back law enforcement and gain entry to the Capitol, he entered the

Capitol through a broken window and could be seen there from at least around 4:17 p.m. to

around 4:30 p.m., as other rioters passed out broken furniture from the room.

59.     In short, Morss came prepared for violence and then repeatedly led the violent

mob attacking law enforcement in an effort to overtake the Capitol.   His actions inherently

prove he is a danger to the community at large, and the law enforcement officers who stand in

the way of his ideological beliefs, whose safety can only be assured by his detention.

60.     As the *Munchel* panel noted, "those who actually assaulted police officers . . . are

in a different category of dangerousness than those who cheered on the violence or entered the

Capitol after others cleared the way." 991 F.3d at 1284.  Here, Morss did not just cheer on

Case 1:21-cr-00040-TNM   Document 176   Filed 11/18/21   Page 27 of 33

violence, nor was he just a participant.  Morss repeatedly led and organized multiple assaults against law enforcement over a prolonged period of time.  He is charged with serious felonies as a result.  He led and completed these assaults on multiple officers, despite the fact that he was in an extremely public setting, around people filming his behavior, and in the presence of many additional different law enforcement officers.   Morss came prepared for battle, dressed in tactical gear, wearing goggles, and carrying a knife and scissors, and a tourniquet.  Morss actively tried to destroy evidence of the crime as it was occurring, telling another rioter to block out or take out a camera as he organized the assault in the Lower West Terrace tunnel.  Finally, there is some evidence that Morss is not done with his efforts, as he had a handwritten how-to list for creating a local militia that included steps like "Bring Assault Rifle" and decided to pen a speech to a future judge regarding his "resounding" lack of remorse.   With all of these factors taken into consideration, the nature and circumstances of these offenses overwhelmingly weigh in favor of detention.

## Weight of the Evidence Against the Defendant

61.     The second factor to be considered, the weight of the evidence, also clearly weighs in favor of detention.  The evidence against the Defendant is also quite strong and compelling. As noted above, the Defendant was observed on multiple high-definition videos, including U.S. Capitol surveillance cameras, social media videos, BWC, and media footage, attacking law enforcement officers as part of an unlawful attempt enter the Capitol.  Multiple witnesses identified him in high-definition photographs from that day.  Financial records tie him to D.C. on January 6.  The clothes he can be seen wearing on January 6 were recovered. Moreover, multiple texts after January 6 reflect his consciousness of guilt, including repeated concerns over the

27

"ramifications" from his actions on January 6 and his fear of being arrested.   The evidence against this Defendant is overwhelmingly strong, and accordingly, the weight of the evidence weighs heavily in favor of detention.

### Defendant's History and Characteristics

62.     The government recognizes that the Defendant has no prior convictions, steady housing, strong family support, a good employment history and the opportunity to work, and community connections. All of which weighs in favor of release.    However, the Defendant's actions, as demonstrated by his apparent willingness to repeatedly engage in assaultive behavior and lead a violent mob attacking law enforcement officers, should give this Court great concern about the danger he would pose to the community, if released.  In addition, his easy access to firearms (a shotgun and two other firearms were found in his home or car during the search at his arrest and he had additional weapons stashed in another location), indication that he plans to create an armed militia, and military training are all characteristics that heighten this risk to the community.

63.     The Defendant was an Army Ranger before his current job, meaning he used the very training instilled in him by the U.S. government to attack the center of our democracy.  His actions on January 6 underlie how these characteristics increase his danger to the community given his willingness to engage in violence to advance his beliefs. As seen on video and highlight by Judge Harvey, he repeatedly organized and ordered around rioters near him and in turn made them much more dangerous.  He organized a shield wall to try and push past officers guarding the Lower West Terrace doors and can be seen on video giving directions to other rioters in the tunnel.  Those rioters then followed his orders, crushing at least one officer in the

process. He can also be seen asking another rioter to block out or take out a camera in the midst of the attack he helped organize.  He can be seen coordinating to rip away a fence being used by an officer to keep the crowd at bay.  Indeed, he is at the forefront of the huge crowd as they surrounded the retreating officers.   He was repeatedly a leader and organizer.  As can be seen on the video, Morss was in his element -- calm, bold, and ready to take charge – all things that you would expect from a former Army Ranger.

64.     He has never disavowed his actions on January 6  -- to the contrary he appears to have written an entire speech in advance for the court regarding his "resounding" lack of regret for his actions that day.  In that speech, he went on to make it perfectly clear that the threat he poses was not cabined to unique political circumstances surrounding January 6, but rather, to use his words, "isn't about politics any longer." Frighteningly, he also kept in his possession a journal with instructions on building a militia.  He kept this even after January 6 (and after his test messages show he was acutely aware that his arrest was likely), which provides additional evidence that he had not changed his mind about whether or not he is willing to use force to enact his beliefs.  Given his access to many firearms in many locations and his unequivocal explanation that he has no regret for his actions on January 6, these journal entries are all the more concerning.  Here, Morss's background and characteristics increase the risk he poses and as a whole his characteristics weigh in favor of detention.

**Danger to the Community and Flight Risk**

65.     The fourth factor, the nature and seriousness of the danger to any person or the community posed by a defendant's release, also weighs in favor of the defendant's detention. The charged offenses involve violent assaultive conduct, and the assaults continued for a

sustained period of time.  He organized rioters assaulting law enforcement with the intent to unlawfully enter the U.S. Capitol and stop the functioning of our government as it met to certify election results. The danger the Defendant caused by leading the violent mob cannot be understated. The Defendant was a spoke in the wheel that caused the historic events of January 6, 2021, and he is thus a danger to our society and a threat to the peaceful functioning of our community.

66.     Morss's dangerousness is not limited to his past actions but presents a future threat. It is difficult to fathom a more serious danger to the community—to the District of Columbia, to the country, or to the fabric of American Democracy—than the one posed by someone who knowingly and eagerly engaged in a violent insurrection to occupy the United States Capitol and abort the certification of a lawful and fair election.  Every person who was present without authority in the Capitol on January 6 contributed to the chaos of that day and the danger posed to law enforcement, the United States Vice President, Members of Congress, and the peaceful transfer of power.  However, Morss violently led that effort and thus his specific conduct aggravated that chaos and danger.

67.     The Defendant's highly public and repeated assaults of officers at the Capitol Building and organizing and leading of others engaged in the same, illustrate his danger to the community.  The United States submits that the Defendant's lack of respect for the rule of law and his unwillingness to abide by lawful government orders goes directly to his future dangerousness. The D.C. Circuit has recognized that a "Court's finding as to [a defendant's] potential compliance is relevant to the ultimate determination of 'whether there are conditions of release that will reasonably assure ... the safety of any other person and the community.'"  *Munchel*, 2991 F.3d at

1281; *see also United States v. Hir*, 517 F.3d 1081, 1092-93 (9th Cir. 2008) (explaining that release conditions require "good faith compliance" and that the circumstances of the charged offenses indicate "that there is an unacceptably high risk that [the defendant] would not comply...with the proposed conditions"); *United States v. Tortora*, 922 F.2d 880, 886–90 (1st Cir. 1990).[4]   The Defendant's actions established that his own personal beliefs override the rule of law and that he will readily resort to violence to halt the legitimate functions of the United States government with which he disagrees.   Such blatant disregard of the law and the valid authority of our government weigh in favor of detention.   If Morss is unwilling to obey orders or to conform his behavior to the law while in full view of many law enforcement officers, the press, and a host of cameras, it is unlikely that he would adhere to this Court's directions and release orders, thereby demonstrating his continued dangerousness.

68.    The fact that the unique circumstances that arose on January 6, 2021, are unlikely to arise in precisely the same context a second time does not minimize his future dangerousness. In contrast to the defendants in *Munchel*, Morss's repeated physical attack on officers protecting the Capitol and the people inside it and his statements and actions beyond that day, prove that he poses a threat regardless of the unique circumstances of January 6, 2021.   Indeed, in the speech he wrote for some future judge declaring his lack of remorse for his actions, he made it clear that his motivations were not limited to a particular political figure or issue that has since gone by the wayside, but rather stated that "this isn't about politics any longer."   His willingness to arm himself

---

[4] The D.C. Circuit has re-iterated this important distinction repeatedly in opinions upholding detention decisions in other Capitol cases.  *See, e.g., United States v. Christopher Joseph Quaglin*, No. 21-3028, 21-CR-40 (TNM)-4 (June 24, 2021); *United States v. Christopher John Worrell*, No. 21-3020, 21-CR-292 (RCL)-1 (May 5, 2021).

on January 6, his leadership role that day, his training in the military and use of that training in the

manner in which he organized and led the rioters on January 6, his interest in creating an armed

militia, his clear lack of remorse or regret for his decisions that day, and his access to weapons

generally, all add the danger he poses to the community if released.  "It cannot be gainsaid that the

violent breach of the Capitol on January 6 was a grave danger to our democracy, and that those

who participated could rightly be subject to detention to safeguard the community." *Munchel*, 991

F.3d at 1284–85.  Morss is one of those who should be detained to safeguard the community.

## CONCLUSION

WHEREFORE, the United States respectfully requests that the Court deny the

Defendant's motion for release and continue to detain the Defendant pending trial.


       Respectfully
       submitted,

       Matthew M. Graves
       United States Attorney
       D.C. Bar No. 481052


       By:

       **MELISSA JACKSON**
       Assistant United States Attorney
       D.C Bar Number 996787
       United States Attorney's Office
       555 Fourth Street, N.W.
       Washington, D.C. 20530
       Telephone: (202) 815-8585
       Email: Melissa.Jackson@USDOJ.GOV