```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA


  UNITED STATES OF AMERICA,      .
                                 .
            Plaintiff,           .  CR No. 21-0040-05 (TNM)
                                 .
       v.                        .
                                 .
  ROBERT MORSS,                  .  Washington, D.C.
                                 .  Tuesday, July 20, 2021
            Defendant.           .  4:00 p.m.
   . . . . . . . . . . . . . . . .
```

```
                 TRANSCRIPT OF DETENTION HEARING
              BEFORE THE HONORABLE G. MICHAEL HARVEY
                 UNITED STATES MAGISTRATE JUDGE
```

APPEARANCES:

```
For the Government:          MELISSA J. JACKSON, AUSA
                             U.S. Attorney's Office
                             555 Fourth Street NW
                             Washington, DC 20530
                             (202) 252-7566


For the Defendant:           KATHLEEN M. GAUGHAN, AFPD
                             ELIZABETH L. TOPLIN, AFPD
                             Federal Public Defender Office
                             601 Walnut Street
                             Suite 540 West
                             Philadelphia, PA 19106
                             (215) 928-1100


Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                             U.S. Courthouse, Room 4704-A
                             333 Constitution Avenue NW
                             Washington, DC 20001
                             (202) 354-3186
```

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

1              P R O C E E D I N G S

2                (Via Videoconference)

3          THE DEPUTY CLERK:  This is case 21-CR-40,

4    United States of America versus Robert Morss.  This is

5    scheduled to be a continued detention hearing held by video.

6    Will the parties please introduce themselves for the Court,

7    beginning with the government.

8          MS. JACKSON:  Good afternoon.  This is

9    AUSA Melissa Jackson on behalf of the United States.

10         MS. GAUGHAN:  Good afternoon, Your Honor.

11   Kathleen Gaughan on behalf of Mr. Morss.

12         MS. TOPLIN:  And this is Elizabeth Toplin as well,

13   Your Honor.

14         THE COURT:  Good afternoon.  And, Mr. Morss, I

15   just want to make sure you can hear me.  Raise your hand.

16      (Defendant complies.)

17         PRETRIAL OFFICER:  Good afternoon, Your Honor.

18   Dashanta Valentine-Lewis, Pretrial Services.

19         THE COURT:  Thank you.

20      I do want to remind everyone who's listening on the

21   public line that pursuant to Chief Judge Howell's Standing Order

22   20-20, recording and rebroadcasting these court proceedings is

23   strictly prohibited.  Violation of that prohibition may result

24   in sanctions, including removal of court-issued media credentials,

25   restricted or denial of entry to future hearings, or other

1    sanctions that the presiding judge believes is necessary.

2         I am prepared now to issue my detention decision.

3    Detention decisions in these Capitol cases are very challenging,

4    and this one is no different.  Each case, each defendant, must

5    be considered on his or her own merits, and there are many

6    factors to consider.  There are certain aspects of this case

7    which weigh in favor of Mr. Morss' release and those that

8    certainly do not.

9         Nevertheless, having considered the entire record before

10   me, including the videos that were submitted last week and

11   the text messages and the parties' arguments and the multiple

12   hearings in this case, I find that, while I do not believe that

13   the defendant is a serious risk of flight, I do believe that

14   the government has demonstrated by clear and convincing evidence

15   that his release would pose a danger to the community and that

16   I can impose no condition or combination of conditions of release

17   that would reasonably mitigate that danger.

18        I am going to review in some detail the basis for my

19   decision now.  The transcript of this proceeding will serve

20   as the written record reflecting my detention decision in this

21   case.  So I direct the parties to order the transcript if they

22   seek to take an appeal.

23        Mr. Morss, you, of course, have the right to appeal this

24   decision to Judge McFadden if you wish.  Your attorneys will

25   help you with any appeal if that's the approach you wish to

1    take.

2        With respect to the basis of my pretrial detention

3    decision, it is as follows:

4        With respect to risk of flight, as I indicated, I find

5    that Mr. Morss is not a serious risk of flight.  He's 28

6    years old.  He has a job.  He has significant connections

7    to his community.  He is close with and has the strong

8    support of his family.  Most significantly, he has no record

9    of prior failures to appear for court or bench warrants.

10   Indeed, he has no criminal record whatsoever.

11       The government points to a number of texts that he

12   sent, or allegedly sent, following the assault on the Capitol,

13   wherein he allegedly states after -- plainly, he was concerned

14   about being identified and arrested for his actions on January

15   6 -- allegedly told a friend that he was "considering leaving

16   the country" because the government was "crushing everyone"

17   involved in the riot on January 6.

18       The government submits no other evidence, though, of

19   any actual planning or preparation of Mr. Morss to leave

20   the country.  Most importantly, those texts were sent in

21   January, and since that time, again, no evidence has been

22   submitted to this court with respect to any plans he may

23   have had to leave the country.

24       And despite all the publicity regarding the scope of

25   the government's investigation and the numbers of rioters

1   who have been arrested, when Mr. Morss was arrested some six

2   months after January 6, he was found in his home in Pennsylvania.

3   So, for all those reasons, I do find that he is not a serious

4   risk of flight.

5        Assessing, however, his danger if he were to be released

6   in the community is a more complicated question.  The Bail

7   Reform Act requires the court to consider four different

8   factors.  The first factor is the nature and circumstances

9   of the offense.

10        Because there was some dispute between the parties as to

11   what the various videos showed in this case, I did direct the

12   government last week to submit those videos for review by the

13   Court.  I have reviewed all them.  Having reviewed those videos

14   and the government's other evidence, whether presented to the

15   Court or proffered, I do make the following specific findings

16   of fact concerning Mr. Morss' alleged conduct on January 6:

17        According to those videos and the government's proffer,

18   Mr. Morss' first interaction with law enforcement at the Capitol

19   on January 6 occurred at about 2:09 p.m.  At that time, a few

20   minutes after a crowd of rioters attempted to push through a

21   fence separating that crowd from the Capitol, Mr. Morss can be

22   seen on body-worn-camera video grabbing a police officer's baton

23   and attempting to rip it away.  That is Government's Exhibit B.

24        A few minutes later, around 2:14 p.m., Mr. Morss appears

25   to speak to a person standing next to him in the crowd, and then

he suddenly reaches through the crowd to grab a fence being held
by a police officer that was being used to keep the crowd back.
Then, it happens quickly, but it appears, with the assistance of
other rioters, Mr. Morss is successful in removing that fence,
which caused that law enforcement officer or officers to retreat
from that position.

I'd further note that it appears from the video that
Mr. Morss acted as something of an accelerant in that situation.
The crowd was standing behind the fencing, not advancing, at
least during the period of time that's in the government's
video; that is until Mr. Morss suddenly pushes to the front,
moves the fencing, both allowing and encouraging the crowd
to advance on law enforcement and the Capitol.  That is
Government's Exhibit C.

A few minutes later, at approximately 2:26 p.m., Mr. Morss
is seen in the crowd when he addresses law enforcement and is
heard saying, "You guys are betraying us.  Do you get paid
enough to betray your people?"  I would note that he at that
point can be seen wearing a tactical vest and goggles.  That
is Government's Exhibit D.

Then around 2:30 p.m., after the crowd again surges forward
and pushes the officers further back, Mr. Morss can be seen on
body-worn camera video, at the front of the rioters, indicating
with his hand that the officers should move back.  He's heard
telling the officers to "back up, back up," and then he tells

them, "Take a look around," pointing to the other rioters around
him, and he states: "Back up.  We're going to take our Capitol
back."  That's Government's Exhibit E.

Shortly thereafter, at approximately 2:33 p.m., Mr. Morss
is seen attempting to pull a helmet visor out of the hands of
a police officer.  The officer is then able to regain control
of the visor.  That is Exhibit F.

At 2:35 p.m., Mr. Morss is seen again near the front of
the line of rioters, motioning at police officers to back up.
That's Government's Exhibit G.

Twenty-two minutes after that, at approximately 2:57 p.m.,
surveillance video shows Mr. Morss standing for a few minutes
near the entrance of the tunnel to the Lower West Terrace
entrance, which is where one of the longest and most violent
pitched battles occurred during the riot.  Mr. Morss can be
seen standing outside the tunnel for a few minutes observing
what is going on in the tunnel.

Around 3:02 p.m., Mr. Morss and a few others push forward
aggressively into the tunnel and towards the front of where
the rioters in the tunnel were confronting the line of officers
guarding that Lower West Terrace door into the Capitol.  That's
Government's Exhibit 8.

For the next few minutes, Mr. Morss is seen in another
video, Exhibit I, pushing and pulling against law enforcement
riot shields and the officers holding those shields inside the

Lower West Terrace tunnel, right at the doors which the
officers were trying to block the rioters from entering.
After about a minute, Mr. Morss could be seen using a shield
to push forcefully against the officers seeking to block the
entrance to the Capitol.  Mr. Morss is seen, with the assistance
of other rioters, successfully ripping a shield away from a
police officer.  Mr. Morss then passes that shield back through
the crowd.  At that point, someone yells, "Send the shields
back, send the shields back."  That's Government Exhibit I.

In a video, seemingly from another angle, similar scene,
Government's Exhibit J, Mr. Morss is seen carrying a shield
away from the line of police officers guarding the entrance
into the Capitol and then passing the shield back into the
crowd of rioters.  Mr. Morss is then seen leaving the tunnel.
That's Government's Exhibit J.

Moments after exiting the tunnel, Mr. Morss is seen yelling
at other rioters to create a "shield wall" and to pass up the
riot shields.  In response, shields were passed from the crowd.
Mr. Morss' direction was at that point standing at the entrance
of the Lower West Terrace tunnel.  That's Government's Exhibit K.

Around 3:07 p.m., Mr. Morss is seen reentering the tunnel
and then yelling at the rioters in the tunnel.  That's
Government's Exhibit L.  There's no audio in that video, but
it does appear that Mr. Morss is yelling at the rioters in the
tunnel.  Mr. Morss is then seen advancing himself towards the

1    front of the rioters as shields are passed forward from

2    the crowd behind him.  That is Government's Exhibit L.

3        Government's Exhibit M confirms all of that.  That video

4    does have sound, and Mr. Morss is heard yelling at rioters in

5    the tunnel, "Hey, everyone with this shield" -- and he's yelling

6    it.  I won't yell it now. --  "Hey, everyone with this shield,

7    back up and organize.  Make a shield wall.  You need to organize

8    right now," he yells, "and make a shield wall."  His words:

9    "Where are those fucking shields?  Let's go.  We need to make

10   a shield wall."  He then leads a chant: "shield wall, shield

11   wall, shield wall."

12       He's then seen pushing in unison against the rioters

13   in front of him.  A few moments later, Ms. Morss instructs

14   another rioter to "block out" or "knock out" -- it's hard to

15   hear what he says.  He says either "block out" or "knock out"

16   the surveillance camera in the tunnel.  The individual he's

17   speaking to then begins to repeatedly knock the camera with

18   the tip of a flagpole, and it appears that that rioter is

19   unsuccessful at disabling the camera.  That's Government's

20   Exhibit M.

21       A few minutes later, around 3:10 p.m., Mr. Morss is seen

22   in the tunnel passing a riot shield to another rioter, and then

23   again pushing in unison with a group in the tunnel, apparently

24   to try to break through the line of officers blocking the

25   entrance of the Capitol.  This appears to be the "heave-ho"

video that the government has referred to.  This is Government's
Exhibit N.

Again, N does not have sound, but the group of rioters
in the tunnel, with Mr. Morss right in the middle, is very
obviously surging in unison back and forward against the line of
police.  This lasts for over a minute before Mr. Morss retreats
out of the tunnel.  At one point, he can also be seen passing
a baton over his head, the rioters behind him.  That is
Government's Exhibit N.

Government's Exhibit O shows the scene from a different
angle, from that of what appears to be a rioter inside the
tunnel.  That video does have sound.  You can hear the rioters
chanting "heave-ho."  You see Mr. Morss in the middle of the
crowd of rioters pushing in unison against law enforcement to
that chant.

The video ends with a view of what is happening at the
front of the rioters, with what impact this surging crowd of
rioters is having on the police officers at the front who are
attempting to block the entrance into the Capitol.  You see
at the end of the video an officer who appears, to me, to be
screaming and baying as he's violently crushed between a door
frame and a shield held by one of the rioters at the front of
Mr. Morss' shield wall, it would appear.

Stated previously, it appears that Mr. Morss left the
tunnel at 3:14 p.m., having been in the tunnel around ten

minutes, maybe a little more.  But an hour later, Mr. Morss is
seen climbing through a broken window into the Capitol building,
into an unoccupied office, unoccupied by any lawmaker or staff.
The government has no information at this time of what, if any,
actions Mr. Morss may have taken in the office when he was there,
though other rioters did damage and topple furniture in that
office.  That is from videos marked as Government's Exhibits P
and Q.  So that is what I believe the videos show.

As a result of all that alleged criminal conduct, Mr.
Morss now faces a nine-count indictment charging him with
two misdemeanors and seven felonies, including two counts of
assault on law enforcement, one count of obstructing an official
proceeding, one count of civil disorder, and three counts of
robbery, or attempted robbery, for the theft or attempted theft
of the barrier fence, baton, and the shield from law enforcement
during the riot.

He faces 15 years on each of the robbery counts, up to
eight years on the assault on law enforcement counts, five
years on the civil disorder count, and up to 20 years in the
obstruction of an official proceeding charge.  Those are
significant federal felony criminal charges, and they do
reflect the seriousness of Mr. Morss' alleged criminal conduct.

Beyond the defendant's charges, Chief Judge Howell, in her
*Chrestman* opinion, outlined a number of criteria in which the
severity of the defendant's conduct on January 6 can be assessed

1    for purposes of detention.

2         Those factors include whether or not the defendant has

3    been charged with a felony or misdemeanor; engaged in prior

4    planning before arriving at the Capitol; carried or used

5    dangerous weapons during the riot; coordinated with other

6    participants before, during, or after the riot; assumed a formal

7    or de facto leadership role in the assault by encouraging other

8    rioters' misconduct; and finally, the nature of the defendant's

9    words and movements during the riot including whether he damaged

10   federal property, threatened or confronted federal officials or

11   law enforcement, or otherwise promoted or celebrated the efforts

12   to dispute the certification of the electoral college vote.

13        Applying those factors here, Mr. Morss' alleged conduct

14   demonstrates the seriousness and dangerousness of that conduct.

15   Again, he's charged with multiple serious felony offenses.

16        There's also evidence that he engaged in prior planning

17   before arriving at the Capitol, from which it can be reasonably

18   inferred that he came to D.C. ready for a fight.  Came dressed

19   in military fatigues, wearing a tactical vest.  Can fairly be

20   inferred from the evidence, I believe, contained armored plates.

21   And texts he sent to someone on January -- prior to January 6,

22   he states that he will be bringing his "plate carrier."

23        And when that tactical vest, which he's seen wearing

24   in the videos, is recovered in the defendant's home upon his

25   arrest, it did in fact have metal plates, armored plates, in it.

So I think the evidence supports the conclusion that the vest
contained those plates.  He was wearing body armor when he came
to the Capitol on January 6.  His vest was also equipped with a
knife, scissors, and tourniquet.  I don't know why anyone would
need any of those items, much less body armor, if their intent
was to engage in a peaceful protest on January 6.

As for carrying or using weapons during the riot, another
one of the *Chrestman* factors, while the defendant apparently
brought a knife in his vest, there's no evidence that he used
it or even took it out or that he used any other conventional
weapon during the riot.  At one point he is seen in the video
pressing a stolen police shield forcefully against a law
enforcement officer, and he's charged for that conduct.
So it's certainly assaultive conduct, but he uses the shield
more as a device to push the officer, not to slash him with it.

On the other hand, in the videos the defendant is also seen
multiple times trying to disarm law enforcement, first ripping
away protective fencing from one officer, then attempting
to strip a baton from another, and then actually ripping a shield
away from a third officer, in each case leaving those officers
less able to defend themselves.  So, in my mind, that conduct
again furthers to distinguish Mr. Morss' conduct from that of
other less violent rioters that day.

There's also evidence here of the defendant's at least
de facto leadership role on January 6 and other *Chrestman*

1   factors.  Most significantly, in the tunnel, as I've described,

2   he organized efforts with the rioters to try to break through

3   that Lower West Terrace door.

4       He pushed his way to the front.  He ripped away a shield

5   from the officer, and he encouraged the rioters to collect other

6   stolen shields and then yelled repeatedly for the rioters to

7   form a shield wall.  And that's what they did.  They used those

8   shields and worked together in tandem to violently push against

9   the officers and, in at least one case, crushing an officer who

10  was guarding those doors.

11      Mr. Morss engaged in similar troubling conduct earlier

12  in the riot when he, once again, acting as a leader or instigator,

13  got others near him to work as a group to remove that protective

14  fencing from the control of a police officer, causing law

15  enforcement to retreat.

16      So, for all these reasons, I do believe that Mr. Morss'

17  alleged conduct on January 6 is not fairly described as a

18  spontaneous "just getting caught up in the moment" kind of

19  thing.  Rather, I find that he came to the Capitol suited up --

20  his words from his texts -- "suited up" for violence.

21      He was an active and enthusiastic participant in the

22  riot for a sustained period of time, over two hours.  And

23  through his direction and coordination, he increased the level

24  of force and violence of rioters around him directed towards

25  law enforcement.  Together, that conduct in my view places

Mr. Morss in a "different category of dangerousness," to use
the words of the Court of Appeals in *Munchel*.  So I do find
that the nature and circumstances of the charged offense weigh
in favor of his pretrial detention.

The second Bail Reform Act factor, the weight of the
government's evidence against the defendant, also weighs in
favor of his detention.  The government's evidence of Mr. Morss'
criminal conduct on January 6 is very strong.

Stated previously, defendant's actions alleged in the
indictment were culled from multiple surveillance videos, police
body-worn camera videos, and on high-definition media and social
media videos.  Multiple witnesses, many of whom know him
personally, have identified him from high-definition photographs
from that day.  Other records, I think they're gas station and
Uber receipts, tie him to the D.C. area on or around January 6.

Further, a search of his home incident to his arrest
resulted in the recovery of the tactical vest and other clothing
and items that he appears to be wearing in the videos from that
day.  The government has also recovered incriminating texts from
Mr. Morss regarding his planning for that day in reaction to the
government's investigation thereafter that I believe reflects a
consciousness of guilt.

That's a very strong case with respect to the government's
charges.  Given what the evidence and videos show he allegedly
did on January 6, the government also has strong evidence of

his dangerousness, as I have outlined.  Accordingly, the weight of the evidence also weighs in favor of his pretrial detention.

With respect to Mr. Morss' history and characteristics, the third Bail Reform Act factor, I've already mentioned many of those characteristics which certainly do weigh in favor of his release.

He has no failures to appear for court.  Indeed, he has no criminal record whatsoever.  He has strong connections to his family and his community including his efforts to become a teacher, his present employment, his commendable work on behalf of veterans -- and I did, I saw the mural.  And I understand that he was instrumental in making that happen, and I appreciate that great effort over the many months that that must have took.

Further, he is a veteran himself, having served with distinction as an Army Ranger with three tours of combat duty in Afghanistan.  He also apparently suffers from untreated PTSD as a result of his combat service but is willing to seek treatment for it as a part of his release in this case, which is a good and commendable thing.

In my view, however, those positive characteristics are undercut by other factors.  First, Mr. Morss' status as a former Army Ranger is undermined, given that it appears that he is willing to use his -- whether you call it "training" or "experience" to organize the rioters on January 6, thereby making their actions against law enforcement more effective,

more forceful, and more violent.

Based on my review of the government's exhibits, Exhibits J through O, the mass of rioters in the West Terrace tunnel appeared disorganized before Mr. Morss arrived; that is, until he ordered them, again and again, to make a shield wall to work in unison against law enforcement.  And that's what the rioters did.  They followed his orders: passed the police shields to the front of their line and surged in unison back and forth against law enforcement, as I said, crushing at least one officer at the front in the process.

Mr. Morss can also be seen directing another rioter to block or knock out a surveillance camera in the tunnel. Earlier in the afternoon, as stated, he can be seen in the video organizing rioters to remove a police barrier fence, which they did, causing law enforcement to retreat.

Thus, Mr. Morss was, in my view, a leader, an instigator, during the riot.  And it appears to me from the videos, in the middle of all that melee, he was in his element.  He was calm, confident, bold - ready, willing, and able to take charge, all things you might expect from a former Army Ranger with battlefield experience.

In *Munchel*, the Court of Appeals directed that assessing the threat posed by a January 6 rioter depends in part on their resources and capabilities.  Here I think those considerations work against Mr. Morss given his military experience and training

and apparent willingness to use it in the service of political
violence, which increases the level of danger that his release
poses to the community.

The second factor that I believe undercuts the other
positive characteristics weighing in favor of his release is
there is evidence that he has not disclaimed the views that
appear to have led to his decision to engage in political
violence on January 6.

He apparently had such misguided beliefs on January 6.
You hear it in the videos, or it can be fairly inferred from
the videos, as he taunts law enforcement protecting the Capitol,
asking them if they got paid enough to betray their people, and
then telling them to back up because he and the other rioters
were "going to take our Capitol back."

Notably, in his texts after January 6, he does express
remorse, but it appears to me to be in the context of him
fearing getting caught for what he had done, and it is followed
quickly with him considering leaving the country to avoid
arrest.  You do not see in those texts any repudiation by him
of the beliefs that apparently led to him engaging in political
violence on January 6 or a repudiation of his alleged conduct
on that day.

Even more concerning, when Mr. Morss was arrested some
six months after the attack on the Capitol, law enforcement
found in his car a notebook that included two handwritten pages.

On one of those pages, it says "Step by Step to Create Hometown Militia."  Notably, as the defense has argued, the pages from the notebook are not dated, raising the possibility that they may have been written by Mr. Morss prior to January 6.  But even if that were the case, the notebook was still in his possession months later.  It does not suggest to me that he has disclaimed its contents.  Just the opposite.

Defense has also argued that the defendant was just "journalling" when he wrote about forming a militia in the notebook.  Even so, it's very concerning for the Court, especially in the context of the defendant's background as an Army Ranger and given what he is alleged to have done on January 6.  And it is some journal, if that's what it is.

Below where he wrote "Step By Step to Creating a Hometown Militia," there is a handwritten list that includes the following: "Buddy Teams," "Room Clearing," "Battle Drills," "Formations," "Reaction to Contact," and "Ambush."  The notes also include a list of what appears to be over 10 names of real individuals the government tells me that were redacted out of the public version, and next to that list of names there are additional handwritten notes that read: "Bring Kit/Body Armor" and "Bring Assault Rifle."

Notably, a firearm was also found in Mr. Morss' car where the notebook was found.  Two more firearms were found in his house.  Three others were recovered from a friend at a

place where Mr. Morss stayed in the months prior to his arrest.
So law enforcement has recovered a total of six firearms
associated with Mr. Morss.  I don't have any reason to believe
that those firearms were unlawfully possessed by him, but,
nevertheless, he does seem to have ready access to firearms.
No assault rifle, however, was recovered.  All of that, in
combination, is concerning to the Court.

In sum, given all of the above, I do find that the positive
aspects of Mr. Morss' history and characteristics are undermined
both by his willingness to use his experience and training in
the service of political violence on January 6, by the absence
of evidence that has repudiated the beliefs that caused him to
engage in that violence allegedly - and, indeed, the evidence
pointing to the contrary, including with respect to the creation
of a hometown militia and by also his easy access to firearms.

So, therefore, I do not believe that the third Bail
Reform Act factor favors release in this case.  Certainly,
in my view, those positive aspects of the defendant's history
and characteristics do not outweigh the other 3142(g) factors
which I believe weigh in favor of his pretrial detention.

The final Bail Reform Act factor, and the ultimate inquiry,
really, is the nature and seriousness of the danger to any
person or the community that would be posed by the defendant's
pretrial release.  For many of the reasons I've already stated,
I find that this factor also weighs in favor of Mr. Morss'

detention.

For this factor, the Court of Appeals observed in *Munchel* the defendant must present "an identified and articulable threat to an individual or the community."  That threat should also be prospective in nature.  Further, such a "threat must be considered in context" and "depends on the nature of the threat identified and the resources and capabilities of the defendant."

The Court also stated in *Munchel* that "those who actually assaulted police officers and broke through windows, doors, and barricades, and those who aided, conspired with, planned, or coordinated such actions, are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way."

That is not a per se rule requiring that all who assault police officers on January 6 are to be detained pretrial.  The Circuit's more recent cases make that clear.  But being charged with such conduct is certainly an important consideration in the dangerousness analysis.  Here, the defendant does fall into that "different category of dangerousness."

He did not just cheer on the violence, nor was he just an idle participant in the riot.  Rather, he's charged with violent offenses stemming from the assaults on the Capitol, three counts of robbery alleging that he stole or attempted to steal equipment from law enforcement needed to protect them.  In that sense, he is like Thomas Sibick, whose pretrial detention was affirmed by

the Circuit in a published decision in May.

According to the Court of Appeals in that case, Mr. Sibick participated in "an ongoing violent assault on a police officer at the Capitol on January 6, 2021, ripping off the officer's radio - his lifeline for help - and his badge."  Mr. Morss engaged in conduct at least as dangerous as that here when he stole police officers' shields and then used them against law enforcement.

Beyond the robbery counts, Mr. Morss also faces those two felony counts for assaulting police officers on January 6, allegations that again charge him with the organization of the rioters to form a shield wall and move in unison against the officers in the West Terrace tunnel.

Mr. Morss led that sustained assault.  Based on my review of the video, he did so in a rather bold fashion despite being in a public setting surrounded by people filming his actions, despite the presence of law enforcement, despite the harm that his actions could cause.

For all those reasons, I do find he's a danger to the community, and measurably more so than many other defendants who entered the Capitol on January 6.  Like Chief Judge Howell found in *Chrestman*, Mr. Morss' conduct raises "grave concerns" about his "disregard for the institutions of government and the rule of law."

This conduct also cannot be construed, I believe, as a

1    momentary lapse of reason in an otherwise law-abiding life

2    as other defendants have successfully argued with respect to

3    their actions at the Capitol.  This violent and assaultive

4    conduct that day was not momentary.  It lasted over hours.

5         And the government has presented evidence that the

6    conduct was not unpremeditated.  Mr. Morss, as I indicated,

7    came prepared for a fight that day.  He didn't stumble into

8    the violence.  I find that he planned for it, and that makes

9    him a significantly greater danger to the community when

10   compared to some other rioters that day.

11        Finally, the Circuit has instructed this court in *Munchel*

12   that it must also consider the "specific circumstances that

13   made it possible on January 6 for a defendant to threaten the

14   peaceful transfer of power" and to consider how the defendant

15   "would be capable of doing so now that the specific circumstances

16   of January 6 have passed."

17        For the reasons I've stated previously, the government

18   has provided, I believe, sufficient evidentiary basis for this

19   court to find that while January 6 may have passed, the fight

20   for Mr. Morss continues.  If he's repudiated the beliefs and

21   views that caused his alleged conduct on January 6, I haven't

22   seen it.  What I have seen, again, are those handwritten notes

23   that he contemplated forming a hometown militia.

24        So, I do find, as Chief Judge Howell did in *Chrestman*,

25   there's sufficient evidentiary basis to believe that Mr. Morss

1    would not refrain from using force and violence in the future,

2    or aid and abet the use of such force and violence by others to

3    advance his views, and that he has the resources and capability

4    to make that threat a real one.  Therefore, for all these

5    reasons, I find that the fourth Bail Reform Act factor weighs

6    in favor of pretrial detention.

7         In sum, considering all those factors, I do find the

8    government has proven by clear and convincing evidence that

9    Mr. Morss' release would pose a danger to the community.  I've

10   also considered all possible conditions of release and believe

11   that they are insufficient to reasonably mitigate the danger

12   that his release would pose to the community.  I do not know of

13   conditions that could reasonably mitigate the risk that he may

14   try to form a militia.

15        I do appreciate the efforts, extreme efforts, made by his

16   parents to try to come up with an acceptable release plan for

17   their son.  They are plainly devoted to him.  But I'm not going

18   to place on them the responsibility to ensure the safety of the

19   community.

20        I believe the danger Mr. Morss' release represents to the

21   community is too great to risk the possibility the conditions I

22   may set are insufficient to mitigate it.  Accordingly, I remand

23   him into the custody of the United States Marshal for pretrial

24   detention.

25        For the record, I have considered Mr. Morss' alleged offense

and history and characteristics in comparison to his codefendants
as well as other January 6 defendants, and I believe the decision
here to detain him today is not inconsistent with the treatment
of those defendants, specifically with respect to his codefendants,
some of whom have been released pretrial.

None of them, in my view, present the same combination
of factors that I believe makes Mr. Morss' release a danger
to the community, including his prior planning for violence
before January 6; his sustained, over two-hour assault on law
enforcement seeking to protect the Capitol; his leadership
of the rioters that increased their violence that day against
law enforcement; his apparent easy access to firearms, and
evidence that he has some interest in forming a militia.
And he has the skills and resources, I believe, to do so.

So, Mr. Morss, you may of course, as I indicated at
the start, appeal my detention decisions to Judge McFadden.
Perhaps he will see it differently.  Your counsel will tell
you how to lodge such an appeal if that's what you wish to do.

Government, anything further we need to do here today?

MS. JACKSON:  The only other issue, Your Honor,
is we'd ask that time be tolled until the next hearing be
held, which is August 5.  It's being tolled in all of his
codefendant cases; and under the standing order we believe
it would also be tolled.  But also in the interest of justice,
we believe it should be tolled given the complex nature of

1    the facts here and the amount of evidence that needs to be

2    properly provided to defense.

3              THE COURT:  Okay.

4        Counsel for the defense, what's your position?

5              MS. GAUGHAN:  Judge, we don't have an objection at

6    this stage for tolling till the August 5th date.

7              THE COURT:  Right.  Just to the next date is all we're

8    tolling it to.  The next date will be before Judge McFadden,

9    August 5.  I will then toll all time for the reasons stated

10   by the government, and with the consent of the defense, all time

11   under the Speedy Trial Act between now and August 5.  I do find

12   that such a tolling would be in the interest of justice and

13   outweighs the interest of the defendant and the public in a

14   speedy trial.  Anything further from the defense?

15             MS. GAUGHAN:  No, Your Honor.  Thank you.

16             THE COURT:  All right.  Mr. Morss, I wish you the

17   best of luck in your case going forward.  I mean that.

18        Parties are excused.

19        (Proceedings adjourned at 4:44 p.m.)

20

21

22

23

24

25

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify
that the foregoing pages are a correct transcript from the
record of proceedings in the above-entitled matter. *

*/s/ Bryan A. Wayne*
Bryan A. Wayne

* PLEASE NOTE:

This hearing was taken via videoconference in compliance
with U.S. District Court standing order(s) during the COVID-
19 pandemic.  Transcript accuracy may be affected by the use
of electronic technology, including but not limited to sound
distortion or audiovisual interference.