IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES,<br><br>      v.<br><br>ROBERT MORSS,<br>      Defendant. | )<br>)<br>)<br>)   Crim. No. 21cr40<br>)   Hon. Trevor McFadden<br>)<br>)<br>)<br>) |

# DEFENDANT'S REPLY TO GOVERNMENT'S OPPOSITION TO MOTION FOR PRE TRIAL RELEASE

Comes now Defendant Robert Morss, by counsel, and replies to the Government's Opposition (Doc 176) to his Emergency Motion to Revoke Detention Order and for Pre Trial Release (Doc 164).

Hyperbole notwithstanding, the government's Opposition ("Opp") offers a catalogue of justifications for Defendant's pre-trial detention - all of which fail to withstand the barest of scrutiny.

As adduced from the Detention order of Magistrate Harvey and from the government's Response in Opposition, Defendant is accused of:

- breaching the Capitol perimeter in or near the forefront of the rioters;
- struggling with law enforcement officers to wrest from them their crowd control fence, batons, riot shields, etc.,
- taunting officers,
- exhorting other rioters to organize and form a shield wall,
- passing riot shields back into the crowd, and
- participating in a "heave-ho" as massed rioters pressed against officers assembled before a Capitol entrance in the West Terrace Tunnel.

Government Exhibits B-Q, Transcript of July 20, 2021 Detention Hearing.

1

Against the Bail Reform Act's presumption in favor of pretrial release, *United States v. Salerno*, 481 U.S. 739, 755 (1989), the government offers a frame by frame rendition of the conduct with which Defendant is charged (Opp at Paras. 8-37) - essentially arguing that the nature of Defendant's alleged offense, without more, connotes a danger to the community justifying confinement.

This Court has already recognized the need to parse the gradations in culpability among the participants in the Capitol Riot when determining who, among the hundreds charged, should be detained pre-rial. *United States v. Chrestman*, ___ F. Supp. 3d ___ (D.D.C. 2021) (20-21 WL 765662 at *7). The District of Columbia Circuit has reaffirmed in the context of the Capitol Riot defendants, the need for "clear and convincing evidence [that] no condition or combinations of circumstances will reasonably secure the safety of any other person and of the community" by reason of an "**identified and articulable** threat to an individual or the community." *United Sates v. Munchel*, 2021 WL 2021 1149196 at *4 (D.C. Cir. Mar. 26, 2021) (quoting *United States v. Salerno*, 481 U.S. 739, 751 (1987) (emphasis added).

The government consistently overstates the ramifications of Defendant's conduct as alleged.

**Robbery**

While Defendant is charged with three counts of Robbery (Opp at para. 51), the violence normally associated with the crime entails force or the threat thereof directed against the person in possession of the object sought. The tugs of war for police riot gear described by the government connote force against the objects in question, not against the officers holding their other ends. Nothing in the government's description suggests an intent to hurt the aggrieved officers or any threat to do so.

**Planning for Violence**

> "Second, as evidenced by his attire (which included goggles, a tactical vest with ballistic plates, a medical kit, a tourniquet, and at least one knife) and his text messages (which discuss the need for walkie-talkies in advance), Morss did engage in some level of planning.  Morss came to the Capitol armed and ready for violence – wearing tactical gear, wearing goggles to no doubt avoid smoke or OC spray, and even having a knife and scissors tucked into his vest. To put it simply, you do not need a ballistic plates to engage in peaceful protest.

Opp at Para. 55.

You do if you are afraid the hooligans of Antifa or that sometimes accompany BLM protests will try to kill you.  Defendant, in fact, never used any of the putatively belligerent gear in his possession.  Further, a tourniquet and scissors (for cutting clothing and dressings) are manifestly non belligerent.  The knife is a tool (with its blade at an angle to the handle, for cutting paracord and such, as opposed to a fighting knife, the blade of which is in line with the handle) that never left its sheath.  Had he been bent on blood, Defendant would have had ample opportunities to do damage – particularly if he had brought any of the firearms to which he had access (Opp at Para. 42).  These all remained home.  The government's incorrect claim to the contrary, Defendant showed no "willingness to arm himself on January 6th."  Opp at Para. 68.  As to talk of walkie-talkies, any "planning," if at all, was presumably *de minimis* since he never had one.

**Militia Notes**

The government expresses concern about two pages of handwritten notes found in a search wherein a supposed template for the formation of a local militia is written.  (Opp at Para. 61.)  Notwithstanding the nefarious connotations attributed to the term by some, there is nothing inherently illegal about a militia.  In fact, the Boy Scouts, founded by a storied British soldier,

3

Lieutenant General Robert Baden Powell, could accurately be called a "militia." Boy Scouts train in outdoor skills and marksmanship, and are organized militarily (Squads, Troops, etc.) for the conduct of small unit maneuvers (e.g., water crossings) similar to those of the military. There is no indication of when – much less why - the notes in question were written, but Defendant is entitled to record his thoughts and experiences as he pleases.

Most importantly, there is no remote indication of a single overt act toward the formation of any militia.

**Manifesto**

Defendant has reportedly memorialized on paper his disdain for this country's current political state. (Opp at Para. 64.) While he could do so perfectly legally, there is no evidence that Defendant has ever actually uttered or otherwise conveyed the words to anyone. Nor is there any remote exhortation to violence in the writing. Troublingly, the government appears to be entirely oblivious to the First Amendment implications of citing this political statement as a justification for pre-trial confinement.

**Organizer**

The government transforms a couple of spontaneous calls for a "shield wall" into:

> "Those rioters then followed his orders, crushing at least
> one officer in the process.

Opp at Para. 63.

While an officer was pinned (but, thankfully, not crushed) between two doors inside the West Terrace Tunnel, there is no indication that Defendant was aware of the man's predicament, much less that he intended, not to mention "ordered," it. The videos show Defendant several ranks away from the unfortunate officer in a dizzying scrum of rioters and police.

There is absolutely no evidence of any role of Defendant in planning or otherwise coordinating the day's events. What the evidence does show are a couple of spontaneous, shouted imprecations to nearby rioters to form a shield wall (of law enforcement riot shields). Nearly identical conduct by co-defendant, Federico Klein, twice screaming for "fresh bodies" in the same scrum, was found by another judge of this Court not to constitute "any real leadership role in the tunnel." *United States v. Klein*, D.D.C. 1:21cr236, Doc 29 ("Klein Opinion") at 15.

**Violence Against Police**

"[H]e did use a shield to push up against officers in the tunnel."
Opp at para. 56.

Defendant never brandished or even held a knife, much less a gun, at the Capitol. He hurt no one. Rather, he is alleged to have struggled with officers for possession of various riot control implements – crowd control fence, baton, shield. Again, the ruling as to co-defendant Klein is instructive. Like Defendant, co-defendant Klein pressed a shield against officers. Klein Opinion at 15. Unlike Defendant, co-defendant Klein also wedged a shield between the West Terrace Tunnel doors so as to keep them open. Klein Opinion at 15. Judge Bates found that Mr. Klein's conduct did not justify pre-trial confinement in that it did not support "a concrete determination that the defendant poses a continuing, 'identified and articulable threat to the community.'" Klein Opinion at 24 (quoting *Munchel*, 2021 WL 1149196 at *4).

> "His most forceful conduct [pushing shields against officers
> as Defendant allegedly did] was directed to advancing and
> maintaining the mob's position in the tunnel,
> not toward inflicting injury… "

Klein Opinion at 24.

**Future Danger**

Yet virtually identical conduct by Defendant excites the government to claim:

5

> "His actions inherently prove that he is a danger to the community at large, and the law enforcement officers who stand in the way of his ideological beliefs.

Opp at 59.

Aside from appearing to oppose "ideological beliefs," the government overlooks with this draconian prediction that this Court, as noted in the Klein Opinion (at 24), has already released similarly or more compromisingly situated defendants: specifically, the defendants in *United States v. Sanford*, D.D.C. 1:21cr86, Doc 1-1 (defendant threw a fire extinguisher at, and hit, an officer and two others); and *United States v. Coffee*, D.D.C. 1:21mj 236, Doc. 1-1 (defendant charged several officers with his crutch, managing to jab one).  By contrast and again as noted in the Klein Opinion (at n. 8), this Court has required far more egregious conduct to justify a finding of future dangerousness.  See, *United States v. Webster*, (defendant struck officer with flagpole multiple times and pinned him to the ground with same); *United States v. Sabol*, D.D.C. 21cr35-1 (defendant dragged an officer out of the tunnel and down the adjacent steps into the crowd); *United States v. Stager*, D.D.C. 1:21cr35 (defendant struck prostrate officer with flagpole); *United States v. Foy*, D.D.C. 1:21cr108 (defendant struck prostrate officer with hockey stick several times); *United States v. Mellis*, D.D.C. 1:21cr206 (defendant repeatedly struck at exposed area between officers' helmets and body armor).

Consider further that the circumstances that impelled Defendant to the Capitol – a pending Electoral College vote certification and a President exhorting his supporters to stop it – are unlikely in the extreme to replicate.  (See, Klein Opinion at 24).

Finally, the government also ignores that Defendant has no criminal record and no indicators of (unsanctioned) violence before the Capitol Riot.  In five months' confinement, he has incurred not a single disciplinary infraction.  To the contrary, he has very favorably

impressed at least one member of the staff at his place of confinement (glowing evaluation by Corrections Officer describing Defendant as "very respectful, reliable and consistent in his work duties," attached).

In truth, however, the conditions of his confinement might have justified disciplinary infractions. The abusive treatment Defendant has suffered at the hands of his jailers in the Central Treatment Facility ("CTF") of the D.C. Jail that necessitated the instant emergency motion, violates his 14th Amendment right to due process (see, *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)), and further impels his pre-trial release.

The vindictive conduct of Defendant's jailers is of a piece with the virulent anti-Trump sentiments of CTF's Deputy Warden, Kathleen Landerkin. Since the election, Deputy Warden Landerkin has repeatedly tweeted anti Trump screeds to include: "Fuck everyone who supports Trump." *DC jail deputy warden housing 1/6 protesters nukes Twitter account after horrific anti-Trump tweets exposed*, Lizzy Murica, Law Enforcement Today, December 12, 2021, www.lawenforcementtoday.com.

**Ranger Training as Harbinger of Future Violence**

Rangering and rioting are not remotely the same thing. Nonetheless, the government claims with absolutely no support that:

> "The defendant was an Army Ranger before his current job, meaning he used this very training instilled in him by the U.S. government to attack the center of our democracy.

Opp at para. 63.[1]

Ranger training and tactics are, in fact, the antithesis of a riot. Aside from rendering candidates malnourished and narcoleptic through deprivation of food and sleep, Ranger training

---

[1] Magistrate Judge Harvey was similarly misguided when he ruled, "his military experience and training and apparent willingness to use it in the service of political violence… increases the level of danger that his release poses to the community." Transcript of July 20 Detention Hearing at 17-18.

7

stresses precisely modulated control and deployment of troops and resources (supplies, firepower, etc.) in the pursuit of specific missions (e.g., ambush, reconnaissance, etc.) – an utter contradiction of the wanton destruction of a riot. (See attached Declaration of former Ranger training cadre officer COL Robert Shaw.)

Contrast the perfervid allusion to Defendant's Ranger training and service, to the almost casual allusion in the Klein Opinion to co-defendant Klein's almost certainly noteworthy service as a Marine in Afghanistan.[2]

While it is true that we want and expect our soldiers, especially our Special Operations soldiers, to be "calm, confident, bold – ready, willing, and able to take charge – all things you would expect from a former Army Ranger," (Transcript of July 20, 2021 Detention Hearing at 17), self-possession is a desired outcome of all military training. To diminish for veterans the general presumption against pre-trial confinement would be to deny them equal protection under the law.

## CONCLUSION

Defendant has an excellent release plan in place. Notwithstanding he was fired upon his arrest from his job as a public high school teacher in Pennsylvania, Defendant has been offered a new job with Glenshaw Steel Supply of Glenshaw, Pennsylvania. (Offer of Employment attached.)[3] His mother, Angela Morss, stands ready to take him into the home that she owns (located within easy commuting distance of Glenshaw Steel Supply), to serve as his Third Party Custodian, and guarantor of his compliance with any conditions the Court should impose (to include GPS monitoring).

---

[2] Undersigned notes that he knows several former Marines who would not smile at the comparison implicit in Judge Bates' treatment of co-defendant Klein's Marine service and Magistrate Judge Harvey's treatment of Defendant's Ranger service, of the respective lethality of the two formations.
[3] An earlier offer of employment from a DC metro area elementary school has been retracted for fear of generating controversy.

An objective appraisal of the conduct Defendant's alleged conduct, his history, his present circumstances and the particularly onerous conditions of his pre trial confinement, undeniably calls for his release.  Unfortunately, there is nothing objective about the government's treatment of this case.

> "The United States submits that the defendant's lack of respect for the rule of law and his unwillingness to abide by lawful government orders goes directly to his future dangerousness.

Opp at Para. 67.

Besides conflating mere lawlessness with dangerousness, the government's rubric for pre-trial confinement encompasses every single rioter since every one presumably ignored law enforcement commands to desist or disperse.

More importantly, the government ignores that the rioters chose to ignore the "lawful government orders" of the assembled police because they had already received a very different command from the highest authority in the land.  Just prior to the breach of the Capitol, President Trump exhorted the assembled protesters at the Ellipse.  He said, in part:

> "These people [referring to his crowd while addressing media] are not going to take it any longer."
>
> "They rigged an election."
>
> "We won this election and we won it by a landslide."
>
> "All of us here today do not want to see our election victory stolen."
>
> "We will never give up."
>
> "Our country has had enough and we will not take it anymore."
>
> "We will stop the steal."
>
> "If you don't fight like hell, you're not going to have a country anymore."
>
> "Peacefully and patriotically, make your voices heard."

"We are going to the Capitol."

*Capitol riots: Did Trump's words at rally incite violence?* BBC News, January 13, 2021, www.bbc.com.

Whether or not the penultimate sentence could reasonably be expected to calm the already agitated crowd, the sitting President of the United States told the crowd to go the Capitol and "Stop the Steal."

> "A criminal defendant may assert an entrapment-by-estoppel defense when the government affirmatively assures him that certain conduct is lawful, the defendant thereafter engages in the conduct in reasonable reliance on those assurances, and a criminal prosecution based upon the conduct ensues.

*United States v. Aquino-Chacon*, 109 F. 3d 936, 938-39 (4th Cir. 1997) (citing *Raley v. Ohio,* 360 U.S. at 423, 438-39 (1959); *United States v. Clark*, 986 F.2d 65, 69 (4th Cir. 1993); *United States v. Howell*, 37 F.3d 1197, 1204 (7th Cir. 1994)).

Whatever transpired once they arrived at the Capitol, the protesters were entitled to do as the President directed.

Many details of the ensuing interactions between the protesters turned rioters and the assembled police are, at present, still unclear, but indicators are emerging that significantly diminish the government's narrative of a ravening mob attacking a brave contingent of law enforcement dutifully defending democracy.

In fact, the riot's progress may have been significantly influenced by the government. There does not appear to be much informed disagreement at this juncture, that law enforcement failed to mount a professional response to the possibility of unrest consequent to the Stop the Steal protest.  Recent media accounts, however, also suggest that government agents may have been involved in the riot's creation and progress.

A Proud Boy rioter and informant for the FBI reportedly communicated with his official handler throughout the riot.  *Among Those Who Marched Into the Capitol on January 6: An F.B.I. Informant,* Alan Feuer, New York Times, October 18, 2021.  www.nytimes.com.

Six Capitol Police officers face discipline for misconduct on that day, one for taking a "selfie" with a rioter and another for "clearing the way" for the rioters' entry.  *Capitol Police recommends discipline against six officers in connection with January 6*, Emily Brooks, Washington Examiner, September 13, 2021, www.washingtonexaminer.com

A recently surfaced video from a security camera in the depths of the West Terrace Tunnel reveals several "rioters" in street clothes repeatedly entering and exiting the tunnel mouth wherein they confer with the assembled law enforcement officers.  *January 6 Police Beating Victim Speaks: 'I Could Have Died,'* Julie Kelly, American Greatness, December 8, 2021, www.amgreatness.com.  The conduct of these apparent undercover officers begs the question as to how much of the rioters' conduct may actually have been abetted or even instigated by undercover law enforcement.

Much more disturbingly, the same video reveals a white shirted officer (presumably an MPD supervisor) repeatedly clubbing a woman in the head as she stands before the phalanx of officers in the tunnel with her hands at her side and unable to move because of the mass of protesters behind her. The white shirted office continues to hit her and, eventually, you start to see the blood.

The emerging picture of the day may reveal something far more nuanced than a simple mob assault on law enforcement – but instead something more akin, at least in some cases, to mutual combat implicating considerations of self defense and the defense of others.

11

A comprehensive (i.e., accurate) understanding of the Capitol Riot is necessary to the effective defense to which Defendant is entitled under the Sixth Amendment. Such an understanding, however, will take time. To confine Defendant pre-trial effectively precludes him from developing adequately his defense as the burden of his confinement, and consequent pressure to seek a resolution of his charges by agreement, contraposes his recourse to the ongoing incremental illumination of the day's events.[4]

A comprehensive picture of the day's events will emerge eventually. In the interim, government hyperbole does nothing to assist the search for the truth – or for justice for the day's malefactors on both sides.

> "It is difficult to fathom a more serious danger to the community, to the District of Columbia, to the country, or to the fabric of our American Democracy – than the one posed by someone who knowingly and eagerly engaged in a violent insurrection to occupy the United States Capitol and abort the certification of a lawful and fair election.

Opp at Para. 66.

It may be hard for the government to imagine, but undersigned imagines that any of the people responsible for contributing to Washington, D.C.'s highest homicide rate in 18 years, (*DC Homicide Count Hits 200 and Highest Point in 18 Years*, Andrea Swalec, News 4 Washington, November 23, 2021, www.nccwashington.com), would pose "a more serious danger" than Defendant.

Putting aside the absolute lack of any specific evidence of an "insurrection" (i.e., evidence of any specific measure to "take control of [the] government," merriam-webster.com, as opposed to merely creating a disturbance), the government's characterization comprises every single participant in the riot. This Court has already ruled that the scourge of pre-trial

---

[4] Defendant intends, if his motion is granted, to waive his Speedy Trial rights thenceforth. As of now, he continues to assert them.

confinement should visit only the most culpable of the Capitol Riot defendants. *United States v. Chrestman*, ___ F. Supp. 3d ___ (D.D.C. 2021), (2021 WL 765662 at *7).

More troubling, however, is the government's conclusory surplusage that the last presidential election was "lawful and fair." A lot of concerned citizens do not agree. Half the country voted for President Trump in the last election and many of them continue to harbor serious doubts about the veracity of the announced election result. While unprovoked violence is never justified, skepticism about the announced election result is neither criminal nor inappropriate to a dialogue of civic engagement. Moreover, proof of a Capitol Riot defendant's personal beliefs about the last election is not required to establish an element of any of the crimes charged. Nor is the question appropriately considered in the context of pretrial detention. The government's gratuitous inclusion of this opinion connotes the institutional belief of the Executive Branch that disagreement on the issue of the election's legitimacy calls for punishment.

The right to disagree is the heart and soul of the First Amendment and the cornerstone of our American Democracy – the most successful experiment in governance that the world has ever known. What the Republic needs is a restoration of faith in our elections, not politicized law enforcement criminalizing everyone who disagrees with the political party that has been credited with the win.

      Respectfully submitted,

      ROBERT MORSS
      By Counsel

      _____/s/_____
      John C. Kiyonaga

      600 Cameron Street
      Alexandria, Virginia 22314

        Telephone: (703) 739-0009
        Facsimile: (703) 340-1642
        E-mail: john@johnckiyonagaa.com

        Counsel for the Defendant

<u>Certificate of Electronic Service</u>

    I hereby certify that on December 15, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, with consequent service on all parties.

        \_\_\_\_/s/_____
        John C. Kiyonaga