**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-40-05** |
| **ROBERT MORSS** | |
|     **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Robert Morss to a term of 109 months' incarceration, three years of supervised release, $2000 in restitution, and a mandatory assessment of $300. The United States is not seeking a fine but requests an accounting of the more than $50,000 that the defendant has raised since his arrest in this case. This sentence is at the midpoint of Morss's sentencing guidelines range as calculated by the government, and reflects both his conduct, as well as his acceptance of responsibility in proceeding by way of a stipulated trial.

The defendant, Robert Morss, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United

1

On January 6, 2021, Morss drove from Pennsylvania to Washington D.C. with the expectation that there would be violence, and he came ready for the fight. As a former Army Ranger, Morss dressed for battle, wearing camouflage clothing and a tactical vest filled with armored plates weighing over 20 lbs. After attending the Stop the Steal rally on the Ellipse, Morss was part of the crowd that aggressively challenged police on the West Front of the Capitol, ultimately causing the police line to collapse and enabling the rioters to flood onto the Lower West Terrace. As police attempted to keep the crowd at bay, Morss added to the chaos and violence by attempting to steal a police baton from an officer and then, later, working with others to rip a portion of bike rack fencing away from officers who were holding the police line across the terrace. Once the police line collapsed, Morss scuffled with retreating police officers, engaging in a tug of war with a police officer over a visor. He then made his way to the Lower West Terrace tunnel, where he participated in numerous violent acts, including ripping a shield away from an officer stationed inside of the tunnel, creating a "shield wall" from stolen police riot shields and joining in a "heave ho" effort with other rioters to push through the police line. Morss later also entered the Capitol through a broken window and passed items out to others to be used as weapons against the police.

The government recommends that the Court sentence Morss to 109 months' incarceration, which is at the middle of the advisory Guidelines' range of 97-121 months, which the government submits is the correct Guidelines calculation. A 109-month sentence reflects the

---

States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

gravity of Morss' conduct, but also acknowledges his willingness to accept responsibly in a stipulated trial.

## I.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 430, ¶¶ 1-7, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. This Court also presided over the trial of three codefendants in this matter and is well aware of the protracted and violent attack on the officers on the West Front and in the Lower West Terrace tunnel.

### B.  Morss' Role in the January 6, 2021 Attack on the Capitol

In the days leading up to the riot, Morss expressed his expectations for what would take place in Washington D.C.  On January 4, 2021, just two days before the riot, Morss texted about his preparations for going to Washington, D.C., saying that that he would "have [his] plate carrier on as well" and that he was "ready for anything and everything brotha."  Morss's statements about his preparation for January 6th followed earlier messages in which he discussed anticipated political violence.  For example, on November 6, 2020, he texted about going to the Pennsylvania state capitol, stating "It's not time to be violent yet, but when the day comes the[y] will know where I stand because I was at my capital [sic] building tomorrow[.]" Later, on December 31, 2020, Morss texted another individual that he was "excited for the 6th." When that individual asked "What's the 6th?", Morss sent a screen capture of a Tweet with an image of the text: "America Will Not Be 'Reset' America Will Be Reborn" and "1776 Will Commence Again

3

January 6th, 2021, Washington, D.C." and a picture of former President Trump next to the words "Be there, Will be Wild." Morss followed up this image with a text to that individual, "IT'S GOING DOWWWWWWWN!!!!!"

In preparation for the violence that Morss anticipated, the former Army Ranger wore camouflage pants, a camouflage shirt, and a tactical vest filled with armored plates weighing over 20 pounds, and carried a black knife sheath with a knife, scissors, and goggles. He was armed, dressed in battle gear, and "ready for anything and everything brotha."



**Image 1:**
*Morss as he appeared on January 6, 2021 on the Lower West Terrace*

4



***Images 2.1, 2.2, 2.3, 2.4 (clockwise from top left):*** *Photographs of the tactical vest with armored plates recovered following Morss' arrest*

After driving from Pennsylvania and attending the "Stop the Steal" Rally on the Ellipse, Morss then made his way to the forefront of the crowd on the West Front and participated in the violence that ultimately overwhelmed the officers on the Lower West Terrace.  Starting at approximately 2:09 p.m., Morss was captured on camera opposing the police officers guarding

the terrace.  As officers attempted to secure the line of bike racks keeping rioters at bay, Morss reached out and grabbed at the baton of MPD Officer B.G. and attempted to pull it out of his hands.  That early attempt to disarm officers guarding the Lower West Terrace was not successful, but Morss did not stop there.  *See* Gov't Sentencing Ex. 1 – Video of Baton Grab from B.G.



***Image 3:*** *Morss reaching for the baton of MPD Officer B.G.*

Morss continued to interfere with the police, becoming even more aggressive as time went on.  As officers stood guarding the police line that had been established using metal bike racks, Morss approached the line at about 2:10 p.m., and began pulling on a bike rack.  Then, as he fell back, he observed a small group of approximately five police officers who had gone out into the crowd to disarm a rioter who had activated a taser, later identified as Defendant Alan

Byerly.[2]  Seeing Byerly on the ground, with officers surrounding him, Morss advanced on them and tried to pull Byerly away from the officers.  When that failed, Morss physically engaged with one of the officers, preventing him from assisting his colleagues in their tactical takedown.



***Image 4:***  *Morss scuffling with officer on the LWT*

After the group of officers had returned to the safety of the police line, Morss resumed his efforts to weaken that line.  At 2:14 p.m., he ripped a segment of bike rack out of the hands of Officer J.C. and dragged it into the crowd.  *See* Gov't Sentencing Ex. 2 – Video of Morss Pulling Bike Rack from Officer J.C.  This effort successfully weakened the police line in this location and deprived the officers there of any barrier to protect them from the crowd, making it far easier for the crowd to later overwhelm the police line and take control of the entire terrace.

---

[2] *See United States v. Alan Byerly*, 21-cr-527-RDM



***Image 5:*** *Morss ripping the bike rack fencing out of the grip of*
*MPD Officer J.C.*

Morss then lingered near the front of the crowd immediately in front of the police line. At 2:26 p.m., just two minutes before the police line collapsed, Morss challenged the officers in front of him saying, "You guys are betraying us.  Do you get paid enough to betray your people?"  *See* Gov't Sentencing Ex. 3 – Video of Morss at Police Line.  Within two minutes, at approximately 2:28 p.m., the crowd surged forward – including Morss – and the police line began to collapse across the entire plaza.  Morss then remained at the forefront of the crowd as the mob forced the officers to retreat and took control of the terrace.

Between 2:30 and 2:35 p.m., Morss actively participated in the mob's efforts to push the police entirely off of the Lower West Terrace.  At approximately 2:30 p.m., as the mob continued to surge forward, Morss was captured on video waiving a yellow flag, saying "take a

look around, back up, we are going to take our Capitol back." Around 2:33 p.m., Morss and two unidentified individuals struggled over a black flagpole with an MPD officer. Moments later, a helmet visor was thrown at an MPD officer, presumably by someone in the crowd. The MPD officer attempted to pick up the visor off the ground, but Morss grabbed the visor as well and attempted to pull it out of the MPD officer's hands several times as the officer struggled with him. The MPD Officer was ultimately able to gain control over the visor. *See* Gov't Sentencing Ex. 4 – Video of Morss Struggle Over Visor. As police were forced to continue their retreat, Morss continued his advance deeper into the Capitol complex. At 2:35 p.m., Morss motioned to officers to retreat while holding a yellow flag.

By 2:40 p.m. rioters had engulfed the west side of the United States Capitol and were climbing on the scaffolding in front of building as well as various features of the building. Although the Capitol Building had already been breached and rioters had flooded in through several entrances, a group of Metropolitan Police Department (MPD) officers and United States Capitol Police (USCP) officers were working to bar rioters from entering the Capitol through the tunnel entrance. This resulted in a sustained onslaught, during which rioters and the police spent over two hours battling for control over the tunnel.

Morss arrived at the tunnel by 2:57 p.m., when the battle for its control was in full tilt. After hanging back at the tunnel entrance for several minutes, at 3:02 p.m. he then began to push forward toward the line of officers and became a violent part of the tunnel mob.

9



***Image 6:*** *Morss moving forward in LWT tunnel*

Morss then directly confronted the officers at the front of the police line and began to engage in physical violence with the officers there.  At approximately 3:05 p.m., he grabbed a police riot shield held by MPD Officer P.N. and, with the assistance of other rioters, attempted to rip the shield out of his hands.  *See* Gov't Sentencing Ex's. 5 & 6 – Videos of Shield Grab from P.N. As Morss used the full weight of his body to attempt to rip the shield away from Officer P.N., someone nearby yelled "send the shield back, send the shield back!" Together, Morss and the rioters assisting him successfully ripped the USCP riot shield from Officer P.N.  He then passed the shield back to the rioters behind him, who passed it back into the crowd.



***Image 7:***  *Morss pulling shield from MPD Officer P.N.*

Morss then retreated back to the tunnel entrance for several minutes, giving himself a reprieve denied to the exhausted officers.  At 3:07 p.m., he reentered the tunnel to continue his effort to push through the police line. While inside, Morss yelled out: "Hey, everyone with a shield, back up and organize! Make a shield wall! Organize right now and make a shield wall. Where are those fucking shields!"  *See* Gov't Sentencing Ex.'s 7 & 8 – Tunnel Video/Shield Wall.  He then joined the crowd in pushing against the police line.  *See* Gov't Ex. 9 – Tunnel Video/Shield Wall.  Morss remained in the tunnel for several additional minutes and participated in the "heave ho" effort by the crowd at approximately 3:11 p.m., in which Officer Daniel Hodges was crushed between the double doors and a riot shield being wielded by codefendant Patrick McCaughey.

Morss ultimately left the tunnel at approximately 3:14 p.m.  However, he did not leave the Capitol Grounds and was filmed again at approximately 3:48 p.m. as he stood in the crowd

near a window to the right of the archway entrance to the Lower West Terrace doors into the Capitol. Other rioters had broken the window at that location, which allowed access to inside of the Capitol building.  Morss and others then climbed through the broken window, which led into hideaway office "ST2M" for members of Congress, but was not specifically assigned to anyone on January 6.  *See* Gov't Sentencing Ex.'s 10 & 11 – Videos of Entry to Capitol.  Morss later took some furniture, specifically a chair, and passed it out of the broken window to the rioters on the inaugural stage.

Morss eventually left the Capitol grounds and returned to Pennsylvania.  A few days later, he confirmed that he was not only at the Capitol, but that he had been wearing body armor, when he texted another individual saying:  "This is Robert one of the guys in armor you met at the rally last Wednesday. I hope you got out of DC safe." On January 27, 2021, when law enforcement was actively investigating the riot, Morss wrote a long note in his iPhone Notes application, titled: "Should I have to appeal before a judge what am I gonna say."  The nine-paragraph note included statements such as "[y]ou ask if I regret my involvement and what happened on the sixth my answer is resounding no" and "[i]f you thought that the capital [sic] as a temple of democracy was desecrated in a matter of five hours you choose not to see the desecration to our rights that has taken place within those halls of power for the last half century." *See* Gov't Sentencing Ex. 12.

### *Injuries*

Following the riot, MPD Officer P.N. reported numerous injuries.  Although Officer P.N. cannot attribute his injuries specifically to Morss, the defendant's actions on that day contributed to the overall dangerousness and violence for those officers on the Lower West Terrace and in

the tunnel.  His actions also and emboldened other violent rioters around him and increased the overall use of force against the officers.

## II.   THE CHARGES AND STIPULATED TRIAL

On December 1, 2021, a federal grand jury returned the fifth superseding indictment charging nine codefendants, including Morss, in a 53-count indictment.  Morss was charged in eleven of those counts, specifically: Count Five, charging Robbery, in violation of 18 U.S.C. § 2111; Counts 6 and 20, charging Robbery and Aiding and Abetting, in violation of 18 U.S.C. §§ 2111 and 2; Counts 10 and 27, charging Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting, in violation of 18 U.S.C. §§ 111(a)(1) and 2; Count 34, charging Obstruction of an Official Proceeding (Aiding and Abetting), in violation of 18 U.S.C. §§ 1512(c)(2) and 2; Count 35, charging Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); Count 41, charging Disorderly and Disruptive Conduct with a Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(2) and (b)(1)(A); Count 49, charging Physical Violence with a Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(4) and (b)(1)(A); Count 52, charging Disorderly Conduct in a Capitol Building (Aiding and Abetting), in violation of 40 U.S.C. § 5104(e)(2)(D) and 18 U.S.C. § 2; and Count 53, charging Act of Physical Violence in Capitol Grounds, in violation of 40 U.S.C. § 5104(e)(2)(F) and 18 U.S.C. § 2.

On August 23, 2022, Morss was convicted of three counts, specifically Count 20 (Robbery), Count 27 (Assaulting, Resisting, or Impeding Certain Officers) and Count 34 (Obstruction of an Official Proceeding) following a stipulated trial with agreed-upon facts.  The remaining counts will be dismissed at the time of sentencing.

### III.     STATUTORY PENALTIES

Morss now faces sentencing for three counts: (1) Robbery (Aiding and Abetting), in violation of 18 U.S.C. §§ 2111 and 2, which carries a maximum term of incarceration of 15 years; (2) Assaulting, Resisting, or Impeding Certain Officers (Aiding and Abetting), in violation of 18 U.S.C. §§ 111(a)(1) and 2, which carries a maximum term of incarceration of 8 years; and (3) Obstruction of an Official Proceeding (Aiding and Abetting), in violation of 18 U.S.C. §§ 1512(c)(2) and 2, which carries a maximum penalty of not more than 20 years of incarceration. For each of these three charges, the term of supervised release is not more than three years, a fine of up to $250,000, and a mandatory special assessment of $100.

### IV.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. Following the steps set forth in the Guidelines, the United States calculates Morss's sentencing guidelines as follows:

**Count 20: Robbery (Aiding and Abetting), 18 U.S.C. §§ 2111 and 2 (Morss' theft of riot shield from Officer P.N.)**

| Base Offense Level | 20 | U.S.S.G. § 2B3.1(a) |
|---|---|---|
| Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)."<br><br>The evidence at trial showed that Officer P.N. was dressed in full uniform, guarding the entrance to the Capitol. It was clear that he was a government officer, and that Morss's conduct in stealing Officer P.N.'s riot shield was motivated by the fact that Officer P.N. was performing his official duties in defending the U.S. Capitol building. |
| Adjustment | +4 | U.S.S.G. § 3B1.5(1) and (2): "the defendant was convicted of … a crime of violence; and … (B) the defendant used body armor during the commission of the offense, in preparation for the offense, or in an attempt to avoid apprehension for the offense"<br><br>Morss wore a tactical vest filled with armored plates weighing more than 20 pounds during his commission of the offenses. |
| Total | 30 | |

**Count 27:  Assaulting/Resisting/Impeding Certain Officers (Aiding and Abetting), 18 U.S.C. §§ 111(a)(1) and 2 (Morss' conduct in the tunnel from 3:07 through 3:14 p.m.)**

| Base Offense Level: | 14 | U.S.S.G. §2A2.2 via § 2A2.4(c).<br><br>The cross reference in § 2A2.4(c) applies because the offense was an aggravated assault under § 2A2.2. Application Note 1: "a felonious assault that involved … (D) an intent to commit another felony." Here, the "other felony" is Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2) |
|---|---|---|
| Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)." |

| | | The evidence at trial showed that all the officers in the tunnel were dressed in full uniform, guarding the entrance to the Capitol. It was clear that they were government officers, and that Morss's conduct -- pushing against the police line and in participating in the "heave ho" attack on the officers -- was motivated by the fact that these officers were performing their official duties in defending the U.S. Capitol building. |
|---|---|---|
| Total | 20 | |

### Count 34: Obstruction of an Official Proceeding, 18 U.S.C. §§ 1512(c)(2) and (2)

| Base offense level: | 14 | U.S.S.G. §2J1.2(a) |
|---|---|---|
| Special offense | +8[3] | U.S.S.G. §2J1.2(b)(1)(B): "the offense involved causing |

[3] The government acknowledges that this Court has determined that the enhancements under U.S.S.G. § 2J1.2(b)(1)(B) and (b)(2) do not apply to defendants convicted for their involvement in the January 6 riots on the ground that the offense conduct did not interfere with the "administration of justice." *See United States v. Seefried*, No. 21-CR-287 (TNM), __ F.Supp.3d __, 2022 WL 16528415, at *11 (D.D.C. Oct. 29, 2022). For the reasons stated in the government's submissions in previous January 6 cases involving convictions for violations of 18 U.S.C. § 1512(c)(2), *see, e.g., United States v. Kevin Seefried*, 1:21-cr-00287 (TNM), ECF 135, pp. 20-24 (filed February 2, 2023), the government respectfully disagrees with the Court's ruling. It seeks the enhancements under Section 2J1.2(b)(1)(B) and (b)(2) here to preserve that position.

In the event this Court declines to assess the enhancements under those provisions, the government will request an upward variance to reflect Morss's aggravating conduct that is captured by those enhancements (obstructing a Congressional proceeding and causing or threatening violence), regardless of whether that conduct interfered with the "administration of justice." This Court has consistently granted such upward variances in January 6 cases in which it declined to assess those enhancements. *E.g., United States v. Hale-Cusanelli*, D.D.C. 1:21-cr-00037 (TNM).

Additionally, the government may seek an upward departure under USSG §3A1.4, comment. n.4. The offense of obstruction of an official proceeding "was calculated to influence or affect the conduct of government by intimidation or coercion," but that offense is not one of the enumerated crimes of terrorism in 18 USC § 2332b(g)(5)(B). Mr. Morss' violent conduct was calculated to affect the conduct of government by intimidation: he attempted to prevent Congress from certifying the 2020 Electoral College vote and assaulted and robbed police officers in furtherance of that goal. In such cases an upward departure would be warranted, except that the sentence resulting for such a departure may not exceed the top of the guideline range that would

16

| characteristic | | or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." |
| --- | --- | --- |
| | | For purposes of this enhancement, the "administration of justice" is synonymous with "official proceeding" as defined in 18 U.S.C. § 1515(a)(1), which in the Capitol riot cases refers to a "proceeding before the Congress, § 1515(a)(1)(B). |
| | | There are multiple theories for the application of this characteristic: |
| | | *First*, where a defendant directly caused injury, threatened injury, or damaged property, this enhancement applies based upon the defendant's own acts under § 1B1.3(a)(1)(A). Here, Morss's conduct in the tunnel threatened to cause physical injury to the officers. |
| | | *Second*, U.S.S.G. § 1B1.3(a)(1)(A) encompasses both the defendant's own acts or omissions and those whom the defendant aided, abetted, counseled, commanded, induced, procured, or willfully caused. By joining the crowd in pushing against the police line, and participating in the heave ho effort by the crowd in which Officer Hodges was crushed between the double doors and a riot shield wielded by codefendant McCaughey, Morss aided and abetted those rioters immediately around him who were threatening and assaulting these officers. |
| | | *Third*, Morss is responsible for "all acts … of others involved in jointly undertaken criminal activity" with Morss if those acts were "(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). That provision does not require evidence of pre-planning or conspiracy; its plain terms apply to persons who acted in unison to achieve a common goal. Morss is responsible for the "jointly |

have resulted if the adjustment under this guideline had been applied.

| | | |
|---|---|---|
| | | undertaken criminal activity" of the crowd of rioters he joined, which attempted to breach the Lower West Terrace doors by assaulting officers, in furtherance of the goal to disrupt, delay, and prevent the certification vote, all of which was reasonably foreseeable in connection with that joint criminal activity. |
| Special offense characteristic | +3 | U.S.S.G. §2J1.2(b)(2): "the offense resulted in substantial interference with the administration of justice." The official proceeding of Congress's Joint Session, which was required by the Constitution and federal statute, had to be halted while legislators were physically evacuated for their own safety.<br><br>The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. Morss admitted that he corruptly obstructed and impeded an official proceeding, namely the certification of the Electoral College vote count. The riot resulted in evacuations, vote count delays, officer injuries, and more than $2.8 million in losses. As described herein, law enforcement from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters. |
| Special offense characteristic | +6 | U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)."<br><br>See above. |
| Total | 31 | |

The offenses fall into two groups. Group One is the robbery offense, for which the victim is Officer P.N. The Adjusted Offense Level Subtotal for Group One is 30. Group Two includes both the assault offense and the obstruction offense, because the assault conviction in

Count 27 "embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to" the Count 34 offense of violating 18 U.S.C. § 1512(c)(1). The highest Adjusted Offense Level Subtotal for Group Two is 31. Pursuant to U.S.S.G. 3D1.4(a), "Count as one Unit the Group with the highest offense level. Count one additional Unit for each Group that is equally serious or from 1 to 4 levels less serious." This results in an increase of 2 levels, resulting in a Combined Adjusted Offense Level of 33. With a three-level reduction for acceptance of responsibility, the Total Offense Level is 30.

The U.S. Probation Office calculated Morss's criminal history as category I, which is not disputed. Accordingly, based on the government's calculation of Morss's total adjusted offense level of 30, Morss's sentencing range is 97 to 121 months' incarceration.

## V.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.     Nature and Circumstances of the Offense

Morss's conduct on January 6, 2021 was part of a massive riot that injured numerous police officers, and almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, throwing the United States into a Constitutional crisis. Morss repeatedly struggled with police at the Capitol, assaulting them and trying to take away their weapons and defensive gear. As officers attempted to secure the line of bike racks keeping rioters at bay on the West Front, Morss tried to grab Officer's B.G.'s baton. He then attempted to grab a bike rack and interfered with officers' attempts to subdue an armed suspect. A few minutes later, as officers stood guarding the police line that had been established

using metal bike racks, Morss ripped a section of bike rack from Officer J.C. and dragged it into the crowd, making it easier for the crowd to later overwhelm the police line. He taunted the police. Remaining at the forefront of the mob, as the police retreated, Morss struggled with an officer over a flagpole, and moments later struggled with another officer over a helmet visor. He entered the tunnel and directly confronted officers at the front of the line, pushing against police defending the double doors into the Capitol. He grabbed Officer P.N.'s riot shield, leaving him defenseless, and passed it into the crowd so that it could be turned against the officers. Even after finally leaving the tunnel, he crawled through a broken window into the Capitol, and entered ST2M, a hideaway office space in the Capitol, where he took furniture and passed it to rioters outside, again supplying rioters with makeshift weapons. The protracted, violent nature and circumstances of Morss's behavior are very serious and fully support the government's recommended sentence of 109 months' incarceration.

### B. The History and Characteristics of the Defendant

Morss is a former Army Ranger who completed three tours in Afghanistan between 2011-2015. At the time of the offense, he was working as a history teacher at Shaler Area High School in Pittsburgh Pennsylvania, where he was in a position to shape the developing minds of impressionable teenagers. Morss' is to be commended for his dedication to public service, first in the Army and then as a public high school teacher. This service, however, also comes with a mantel of responsibility and takes on a darker character in the context of the January 6th riot.

With respect to the Army, Morss' training increased the level of dangerousness that he posed to anyone in his path. Not only was he physically capable of inflicting harm on others, and trained to do so, but he also prepared himself for violence in advance. As he shared in his

text messages, he was prepared for a battle that day.  He even dressed in combat gear, wearing camouflage pants, a camouflage shirt, and a tactical vest filled with armored plates weighing over 20 pounds, and carried a black knife sheath with a knife, scissors, and goggles.  He then engaged in multiple acts of violence against officers who were trying to protect the Capitol building.  The image of a battle-dressed Army Ranger turning against his own country and attacking the men and women protecting the Capitol building is striking; in choosing to go on the attack on January 6th, he turned his back on his duty to serve and protect his country as he once did.

Morss actions on January 6 also served as a poor example for his students.  In engaging in sustained violent and obstructive conduct against officers at the foot of and on the inaugural stage for more than an hour, Morss and the mob he enthusiastically joined shattered a more than 200-year-old tradition of the peaceful transfer of American executive power.  Despite having now acknowledged committing these criminal acts, Morss further undermined the rule of law following his arrest by holding himself out to the public and his former students as a "political prisoner."  *See, e.g.* Robert Morss Artist Bio, The Great Wars Mural (available at https://thegreatwarsmural.godaddysites.com/robert-morss).  Morss' history and characteristics indicate someone who should have known better and, when viewed in the light of his extraordinary conduct even when compared to other January 6 defendants, weighs in favor of a lengthy term of incarceration.

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a lengthy sentence of incarceration.  Morss' violence on that day – not only attacking police but actively working to rob them of their protective gear – caused direct harm to officers and also increased the likelihood of those same officers being harmed by other members of the mob.  The conduct on display by those who participated in the January 6th riot falls along a continuum:  as someone who repeatedly used violence against police, worked to rob officers of their protective gear, and later entered the Capitol building, Morss demonstrated the utmost contempt for the law and his conduct falls at the high end of that continuum.

**D.      The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.  In his iPhone note, titled "Should I have to appeal before a judge what am I gonna say," Morss wrote statements such as "[y]ou ask

---

[4] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

if I regret my involvement and what happened on the sixth my answer is resounding no" and "[i]f you thought that the capital as a temple of democracy was desecrated in a matter of five hours you choose not to see the desecration to our rights that has taken place within those halls of power for the last half century."  Morss' own words make it clear that he does not regret his actions and that he views his conduct as justified.  While these words were written two years ago, it is clear that he was not remorseful at that time, was unconcerned about the harm he caused to others, and most certainly would participate in violence again if he viewed the cause as justified.  A lengthy sentence is one of the few consequences that may restrain Morss in the future from violent conduct that he views as justified.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and

every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[6]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating

---

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

For example, in *United States v. Thomas Webster*, 21-cr-208, Judge Mehta sentenced the defendant Thomas Webster after a jury trial to 120 months' incarceration. That case involved a protracted physical assault against a single officer who Webster had picked out from the police line on the West Front. Webster was convicted of violating 18 U.S.C. §111(b), among other crimes, for using a flagpole in his assault on the officer, while the officer defended the Capitol. Webster destroyed evidence and lied under oath during trial.   Webster's conduct was more serious than Morss' conduct, and the government is seeking a less severe sentence than was imposed on Webster. Nonetheless, Webster is a useful comparison because it highlights the appropriateness of a lengthy sentence of incarceration where a defendant has engaged in assaults on officers at the Capitol while wearing body armor in preparation for war.

Similarly, in *United States v. Robertson*, 21-cr-34, Judge Cooper sentenced defendant Thomas Robertson to 87 months of incarceration following his conviction for one count of 18 U.S.C. § 1512(c)(2) and one count of 18 U.S.C. § 231(a)(3). Leading up to January 6, Robertson advocated on social media for the use of violence to overturn the election results. Robertson traveled to Washington, D.C. prepared for violence; he packed a gas mask, food, and a large wooden stick. While on the West Front of the Capitol, Robertson joined a crowd of rioters blocking MPD's Civil Disturbance Unit that was struggling to move through the crowd on the West Plaza where the unit planned to reinforce the Capitol Police line. Robertson stood temporarily in front of the officers, blocking their path and raising his wooden stick in "port arms." The officers had to physically move Robertson to make their way through and, when they

did, Robertson struck two officers with his stick. Robertson then joined the mob of rioters and advance to the Upper West Terrace and into the Capitol building. Robertson made it into the Crypt but eventually left when ordered to do so by law enforcement. After January 6, Robertson bragged that he was proud of his conduct and destroyed his cell phone. Like Robertson, Morss came to Washington, D.C. prepared for violence and joined the mob of rioters on the West Front; like Robertson, he physically engaged with police; and like Robertson, he expressed no remorse for his conduct, instead affirming his conduct to others.

This Court has sentenced five of Morss' codefendants: Patrick McCaughey, Tristan Stevens, David Judd, Geoffrey Sills, and David Mehaffie, all of whom battled police in the tunnel. The sentence of co-defendant Geoffrey Sills provides a useful comparison, in that Sills engaged in multiple acts of violence, robbed an officer of his defensive gear, and contributed to the mayhem on the West Front and Lower West Terrace Tunnel after arriving at the Capitol armed with a gas mask, goggles, and ear plugs.  Sills was sentenced by this Court on March 21, 2023 to a total of 52 months' incarceration after he accepted responsibility via a stipulated trial and expressed remorse during his sentencing.  While Sills brought a gas mask, goggles, and ear plugs to the Capitol, Morss wore a tactical vest with body armor, and carried a knife. Moreover, unlike Sills, Morss has not expressed remorse.  Morss faces a higher sentencing guideline range, and the government seeks a higher sentence.

## VI.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose

restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*).[7] Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.[8] *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C.

---

[7] While both statutes generally limit restitution to losses resulting from conduct that is the basis of the offense of conviction, they also authorize the court to impose restitution under the terms of a plea agreement. *See* 18 U.S.C. § 3663(a)(3); 18 U.S.C. § 3663A(a)(3); *see also United States v. Zerba*, 983 F.3d 983, 986 (8th Cir. 2020); *United States v. Giudice*, 2020 WL 220089, at *5 (D.N.J., Jan. 15, 2020). The defendant in this case did not enter into a plea agreement.

[8] The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations

§ 3663A(a)(2). "In view of the purpose of the MVRA and the interpretation of the VWPA's definition of 'victim,' we agree with the Government that it is 'inconceivable that ... Congress somehow meant to exclude the Government as a potential victim under the MVRA when it adopted the definition of 'victim' contained in the VWPA.'" *United States v. Ekanem*, 383 F.3d 40, 44 (2d Cir. 2004).

Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[9] *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that

---

omitted).

[9] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review." *Fair*, 699 F.3d at 513. Here, the Court should find that Morss conduct in entering the Capitol as part of the mob and handing furniture out of a broken window to be used by rioters outside caused damage to that building.

"absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[10]

The VWPA also provides that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663(d). Because this case

---

[10] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), see 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Morss to pay $2,000 in restitution for his convictions on Counts 20, 27, and 34. This amount fairly reflects Morss' role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VII.   FINE

The United States is not seeking a fine in this case at this time.  However, through his family members, Morss appears to have raised over $54,000 in an online campaign styled as "The Robert Morss Support Fund."  See https://www.givesendgo.com/LegoMan (last accessed April 20, 2023). The website indicates that "funds will go toward legal and other expenses." Given that the funds appear to be directed toward legal bills, the United States is not seeking a

fine but provides this information for the Court's consideration and asks that the defendant be ordered to give an accounting of the funds that he has raised.

**VIII.   CONCLUSION**

For the reasons set forth above, the government recommends that the Court impose a sentence of 109 months' incarceration, three years of supervised release, $2000 in restitution, and a mandatory assessment of $300.  This sentence is at middle of the defendant's sentencing guidelines range and reflects both his conduct, as well as his acceptance of responsibility by entering into a stipulated trial.

Respectfully submitted,
MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:      */s/ Jocelyn Bond*
JOCELYN BOND
Assistant United States Attorney
DC Bar No. 1008904
U.S. Attorney's Office
601 D Street, N.W.
Washington, D.C.
202-809-0793
Jocelyn.Bond@usdoj.gov